# Wytheville.

## TENNANT AND OTHERS v. DUNLOP.

### JUNE 29, 1899.

1. CHANCERY PRACTICE—*Devastavit—Suit by Legatee Against Executrix and Wrongdoer.*—One who has received a benefit arising from a *devastavit* committed by an executrix, knowing the facts, is primarily liable, and may be united as a defendant with the executrix and held to account in a suit by a legatee.

2. CHANCERY PLEADING—*Prayer for Alternate Relief—Case in Judgment—New Case—Departure.*—A complainant who is uncertain as to the specific relief to which he is entitled may frame the prayer for special relief in the alternative, but the special relief of each kind must be consistent with the case made by the bill. In the case in judgment the original bill charged that a contract of sale of personal property had been induced by the undue influence, misconduct, and fraud of the defendant, and the specific relief prayed for was the actual value of the property. The amended bill repeats the charges of the original bill and supplements them with additional evidences of misconduct and fraud since discovered, and prays for a rescission of the contract; that the property be resold and the proceeds divided between the parties, and for an account of profits. This is not a new case, nor a departure from, nor inconsistent with, the case made by the original bill. The gravamen of both bills is the same misconduct and fraud of the defendant.

3. TRUSTEES—*Purchase of Trust Subject.*—A trustee, or other person acting in a confidential relation is disqualified from purchasing the trust subject. The sale in such case will be set aside, although the price was fair, or the best to be had, and the motive pure.

4. PARTNERSHIP—*Surviving Partner—Rights and Obligations as to Partnership Property—Accountability to Creditors and Representative of Deceased Partner.*—Upon the death of a partner the legal title to the partnership property passes to the surviving partner, and he becomes invested with the exclusive right to its possession, control, and

disposition, for the following purposes: To convert the same into money; to pay the debts of the partnership; and to distribute the surplus between himself and the estate of the deceased partner. While not a trustee properly so-called, he is, nevertheless, a trustee in a certain sense, and subject to the rules and principles of equity governing such, and may be compelled by creditors of the partnership and the representative of the deceased partner to fulfil his obligations as surviving partner.

5. PARTNERSHIP—*Surviving Partner—Contracts with Representative of Deceased Partner.*—Contracts between a surviving partner and the representative of his deceased partner, with respect to the partnership estate, while not interdicted, are regarded with suspicion, and will be jealously scrutinized and only allowed to stand, if assailed, when they appear to be reasonable, fair, and just. This is especially true of a purchase by a surviving partner of the interest of the deceased partner.

6. PARTNERSHIP—*Surviving Partner—Fiduciary Relation to Estate of Deceased Partner—Contract to Purchase Partnership Effects—Disclosures.*—When seeking to purchase the interest of the deceased partner, the surviving partner occupies a fiduciary relation, and it is his duty to acquaint the representative of the deceased with full information as to the assets and the facts from which their value may be estimated or inferred. He cannot simply remain passive, but must make a frank and honest disclosure of all within his possession or knowledge from which a sound judgment may be formed as to the value of the interest to be sold. He cannot hold the representative at arm's length, and seek to make a profit for himself.

7. TRUSTEES—*Contracts with Beneficiary—Independent Advice.*—The fact that a beneficiary, in dealing with the trustee, has sought and obtained independent advice from a person competent to advise as to the particular transaction, will go far to give assurance of its fairness, and to induce a court of equity to uphold it. In the case in judgment, the claim of competent and independent advice to the vendor is not sustained by the evidence.

8. PARTNERSHIP—*Good-Will and Trade-Marks—Partnership Property—Case in Judgment.*—The good-will and trade-marks of a partnership are partnership property, and must be accounted for by the surviving partner the same as the other assets of the firm. In the case in judgment, the partnership agreement contained a like provision, but the representative of the deceased partner was ignorant of the fact, and the surviving partner misrepresented both the law and the facts.

9. GOOD-WILL AND TRADE-MARKS—*How Sold by a Surviving Partner.*— The good-will of a business and trade-marks which are incidents of the business and not of the place of business or plant, with the right to use such trade-marks in the manufacture or sale of the merchandise to which they are attached, may be sold by a surviving partner separately from the plant or property, and also from the book-debts of the partnership.

10. PARTNERSHIP—*Surviving Partner—Purchase of Interest of Deceased Partner at Inadequate Price—Measure of Relief.*—If a surviving partner acquire from the representative of his deceased partner's estate, the interest of the decedent in the partnership assets for an inadequate price, through some mistake of fact, or under a mistaken claim of right calling for redress, the measure of relief, in the absence of all fraud, is the real value of the interest at the date of the sale, with interest thereon from that date.

Appeal from a decree of the Circuit Court of the city of Petersburg, pronounced February 5, 1897, in a suit in chancery, wherein the appellants were the complainants, and the appellee was the defendant.

*Reversed.*

This suit was instituted by the children of D. B. Tennant, who were legatees under his will, against the executrix of said Tennant, and David Dunlop, charging a *devastavit* by said executrix, procured by said Dunlop, and praying that Dunlop might be required to account to the estate of said Tennant for the actual value of the interest of said Tennant in the good-will, brands, and labels of the firm of D. B. Tennant & Co. (of which Dunlop was a partner) and of an individual brand owned by said Tennant, but used by the said firm, all of which brands had been purchased by Dunlop from the executrix, under circumstances, as the bill charged, which constituted a gross breach of trust on his part.

*B. B. Munford, Stiles & Holliday, Allan Potts, Leake & Carter* and *W. R. McKenney,* for the appellants.

Opinion.

*Alexander Hamilton, Christian & Christian,* and *R. B. Davis,* for the appellee.

RIELY, J., delivered the opinion of the court.

The ground of the demurrer is an alleged inconsistency between the original and amended bills, wherefore both, it is asserted, are demurrable and no relief can be given under either of them.

It is further asserted that the amended bill is a radical departure from the original bill and makes a new case; that this is not allowable under the rules and practice of equity pleading, and is a valid ground of demurrer to the amended bill.

The original bill sets forth the sale by the executrix of D. B. Tennant, deceased, to the appellee, David Dunlop, of the interest of her testator in the good-will and tobacco brands of the late firm of D. B. Tennant & Co., composed of the said Tennant and Dunlop, and of a private tobacco brand of D. B. Tennant, used by the firm, and charges that the sale was made at a grossly inadequate price, whereby the executrix committed a breach of duty; that the breach of duty resulted in a loss to the plaintiffs and in a corresponding gain to Dunlop; that the sale was induced by the undue influence, misconduct, and fraud of Dunlop; that he has reaped all the benefit resulting from the *devastavit* of the executrix, and should be made primarily liable therefor; and asks that he may be made to account for the actual value of the assets so improperly obtained, with a prayer for such other and further and general relief as the nature of the case may require, and to equity may seem meet. The bill conforms in its frame and structure to that exhibited in the case of *Patterson* v. *Bondurant,* 30 Gratt. 94, where it was held that one who received a benefit arising from a *devastavit* committed by an executrix, knowing the facts, was primarily liable.

The amended bill repeats all the averments of the original

.bill; it embodies, indeed, the whole of the original bill in *totidem verbis;* supplements it with averments of additional facts, discovered since the filing of the original bill, in substantiation of the same charge of misconduct and fraud; and asks, on account thereof, that the sale made by the executrix to Dunlop of the good-will and tobacco brands be rescinded, that the same be sold by public auction, and the proceeds of sale equally divided between the estate of the deceased partner and the surviving partner; and that the latter be also required to account to the estate of the deceased partner for an equal share of the profits realized from the use of the good-will and brands since his purchase of the interest therein of the deceased partner.

The amended bill does not make a new case or depart in substance from the original bill. It does not differ materially from the original bill, except in the prayer for relief. There is no inconsistency between their respective averments. They both charge the same misconduct and fraud. The amended bill merely accentuates it by the averment of additional facts discovered since the filing of the original bill and the taking of testimony in the cause, which averments are not inconsistent with those of the original bill, and do not make a new or different case of misconduct and fraud, but confirm, if true, that charged in the original bill. The additional allegations of the amended bill were germane to the subject matter of the original bill, and might with entire propriety have been incorporated in it. The gravamen of both bills is the misconduct and fraud of Dunlop in obtaining the interest of his deceased partner in the property in controversy, and virtually the same evidence would be required to sustain either bill, whether the relief sought was adequate compensation, as contemplated by the original bill, or a rescission of the contract of sale, as asked for in the amended bill. The averments of the amended bill were pertinent to the case charged in the original bill, and, as above stated, might have been incorporated therein; and the complainants, being uncer-

tain as to the particular relief to which they were entitled, might have framed the special prayer of the original bill in the alternative, praying for adequate compensation for the property, and, in the alternative, for a rescission of the contract, and a public sale of the property, and an account of profits, the special relief, of each kind, being consistent with the case made by the bill. Story's Eq. Pl., secs. 42 (a) and 42 (b); Barton's Ch. Pr., 266; *Colton* v. *Ross*, 2 Paige, 396; *Lloyd* v. *Brewster*, 4 Paige, 537, 540; *Lingan* v. *Henderson*, 1 Bland, 236, 252; *Murphy* v. *Clark*, 1 Sm. & Marsh, 221, 236, and *Hardin* v. *Boyd*, 113 U. S. 756, 763.

As this variance in the special prayers for relief of the original and amended bills constitutes the only material difference between them, it does not render the latter demurrable. Under the liberal rules of chancery practice which prevail in this country, and particularly in this State, there is no valid objection to the amended bill, and the demurrer to it, and also to the original bill, was properly overruled. *Belton* v. *Apperson*, 26 Gratt. 207; *Parrill* v. *McKinley*, 9 Gratt. 1; *Ferry* v. *Clarke*, 77 Va. 397; *Hanby* v. *Henritze*, 85 Va. 177; *Anthony* v. *Leftwich*, 3 Rand. 238; *Hurt* v. *Jones & Wife*, 75 Va. 341; *Hardin* v. *Boyd*, 113 U. S. 756; *Graffam* v. *Burgess*, 117 U. S. 180; and *Richmond* v. *Irons*, 121 U. S. 27.

In the year 1867 David B. Tennant, who had been engaged for many years in the manufacture of tobacco, associated David Dunlop with himself in the conduct of the said business, under the firm name of D. B. Tennant & Co., which co-partnership continued from its formation until the death of Tennant, on October 6, 1885. The business during the existence of the partnership was eminently successful and profitable. Dunlop, after the death of Tennant, declined to continue the business in partnership with the widow of his deceased partner, and, having decided to continue it by himself, had frequent interviews with her as the executrix of the decedent, with the view of acquiring

his interest in the good-will and trade-marks of the late firm. Being unable to agree upon persons to fix the value thereof, and Dunlop asserting that the good-will and trade-marks survived to him as surviving partner and were his property, but offering to pay $1,000 for the interest of her testator in the good-will of the business, and in the brands and labels of the firm, and $500 for an individual brand of D. B. Tennant used by the firm and called the " Shellard " brand, she accepted his offer.

The complainants, who are the children and residuary legatees of D. B. Tennant, charge in their bills that the sum of $1,500 for the interest of their father in the good-will and trademarks so acquired by Dunlop was grossly inadequate compensation therefor, and that the sale for such insufficient sum was a *devastavit* by the executrix, in which Dunlop fraudulently participated, and from which he has reaped immense benefits. Upon this charge the issue was made up. The inquiry, therefore, is: Shall the purchase as made by Dunlop stand, or shall relief be granted; and if the complainants be entitled to relief, what shall be the nature and extent thereof? These are the main questions in the case before us for decision.

The suit was promptly instituted after the eldest child of the decedent attained his majority, and no question of laches arises as to the right to relief, if he and the other complainants be otherwise entitled to it.

It was insisted in their behalf that the purchase was made by Dunlop under circumstances that created an express trust between him as surviving partner and the executrix of the decedent, and constituted him both buyer and seller. The ground of this position is the claim that when he objected to her suggestion to have the good-will and trade-marks appraised, she proposed that he fix the price himself, and that she would accept what he fixed; that he acceded to her proposal, saying that it was well that she trusted it to him, as he would certainly do her justice; and that he afterwards made the offer of $1,500 and she accepted it.

This was denied by Dunlop, and the contention made in support of his denial that the acceptance of an offer to fix the price himself would have been inconsistent with his claim that the goodwill and trade-marks belonged to him as surviving partner, and that the estate of his deceased partner had no interest therein. If the position of the complainants were established by the testimony, the purchase being assailed, of course could not stand, for it is well settled as a general principle that trustees and all persons acting in a confidential character are disqualified from purchasing. The sale in such case will be set aside, although the price was fair, or the best to be had, and the motive pure. *Harrison* v. *Manson*, 95 Va. 593; *Carter* v. *Harris*, 4 Rand. 199; *Buckles* v. *Lafferty*, 2 Rob. 292; *Bailey* v. *Robinson*, 1 Gratt. 4; and *Howery* v. *Helms*, 20 Gratt. 1. There is much in the record to corroborate the testimony of the executrix in support of the position of the complainants, but as the evidence is conflicting, and a decision on this point is not necessary to a proper determination of the matter in controversy, this view of the case will not be further considered.

It was next asserted that even if an express trust by creation of the parties did not exist at the time of the purchase, nevertheless, Dunlop, as surviving partner, stood under the law in a fiduciary relation to the executrix of the deceased partner, and upon him rested the burden of proving that she was fully informed as to her rights and interest in the good-will and trade-marks, and of the facts necessary for the formation of an intelligent opinion as to their value, and that the compensation paid by him was adequate.

Upon the death of a member of a partnership, the entire legal title to all the partnership property passes to the surviving partner, and he becomes invested with the exclusive right to its possession, control, and disposition, but for certain purposes. His obligations with respect thereto are threefold: (1), To convert the same into money; (2), To pay the debts of the partnership;

and (3); To distribute the surplus between himself and the estate of the deceased partner. In the discharge of these obligations, the decided cases and text-writers generally maintain that, while he is not a trustee properly so called, he is nevertheless a trustee in a certain sense, and is subject to the rules and principles of equity which pertain to persons who sustain a fiduciary relation; that the creditors and the representative of the deceased partner have the right to go into a court of equity and ask for the proper fulfilment of these obligations; and that while the surviving partner and the representative of the deceased partner are not interdicted from contracting with each other with respect to the partnership estate, yet their contracts—and especially the purchase by the surviving partner of the interest of the deceased partner, on account of the generally "dangerous inequality of knowledge with respect to the subject matter of the sale"— are regarded with suspicion, will be jealously scrutinized, and only be allowed to stand, if assailed, where they appear to have been reasonable, fair, and just. Parsons on Part. 441-42; 2 Bates on Part., sec. 743; 5 Wait's Actions and Defences, 143; Meechem's Elements of Part., sec. 268; *Caskie* v. *Harrison,* 76 Va. 86; *Case* v. *Abeel,* 1 Paige, 393; *Ogden* v. *Astor,* 4 Sandf. 311; *Heath* v. *Waters,* 40 Mich. 457; *Killefer* v. *McLain,* 78 Mich. 251; *Nelson* v. *Hayner,* 66 Ill. 487; *Kimball* v. *Lincoln,* 99 Ill. 578; *Galbraith* v. *Tracey,* 153 Ill. 54; *Valentine* v. *Wysor,* 123 Ind. 47; *Farnham* v. *Brooks,* 9 Pick. 233; *Ludlum* v. *Buckingham,* 35 N. J. Eq. 80; *Dayton* v. *Bartlett,* 38 Ohio St. 357; *Offutt* v. *Scott,* 47 Ala. 104; *Brooks* v. *Martin,* 2 Wall. 70; *Gillett* v. *Gafney,* 3 Col. 364; and *Shields* v. *Fuller,* 65 Am. Dec., editor's note, 297-98.

The position that the surviving partner is a trustee in the disposition of the partnership property, and stands in a fiduciary relation to the personal representative of the deceased partner, was strenuously combatted by the able counsel of the appellee. To refute the position, the case of *Knox* v. *Gye,* House of Lords

Appeals, 5 L. R. 656, and particularly the opinion of Lord
Westbury, was mainly relied upon. The question in that case
was the defence of the statute of limitations to a suit brought by
the executor of the deceased partner against the surviving part-
ner, and the remarks of Lord Westbury are to be interpreted
with reference to that particular issue. In the case of an express
trust this defence is unavailable, but as respects constructive
trusts, to which class the trust attributed to the appellee is held
·to belong (*Robinson* v. *Hook*, 4 Mason, 151; and *Farnham* v.
*Brooks*, 9 Pick. 243), it is well settled that they are liable to be
barred by the lapse of time. 2 Wood on Limitations, 533;
*Cholmondeley* v. *Clinton*, 2 Jac. & W. 1; *Robinson* v. *Hook*, 4
Mason, 139; *Farnham* v. *Brooks*, 9 Pick. 212; *Kane* v. *Blood-
good*, 7 John. Ch. R. 90; and *Murray* v. *Coster*, 20 John. R. 756.

The language of Lord Westbury is, therefore, to be construed,
we take it, with reference to the particular question in his mind
for decision, whether a surviving partner, as respects the repre-
sentative of a deceased partner, is a complete trustee, and liable
to all the consequences resulting from that relation, or is only a
*quasi* trustee. While declaring that he is not a trustee, either
expressly or by implication, he nevertheless states that on the
death of a partner the law confers on his representative certain
rights as against the surviving partner, and imposes upon the
latter corresponding obligations, and then adds: " The surviving
partner may be called, so far as these obligations extend, a
trustee for the deceased partner; but when these obligations have
been fulfilled, or are discharged, or terminate by law, the sup-
posed trust is at an end."

It is true that he also says that " there is nothing fiduciary be-
tween the surviving partner and the dead partner's representa-
tive, except that they may respectively sue each other in equity,"
but this position was vigorously controverted as " novel " by the
Lord Chancellor, Lord Hatherly, a most able judge, as was also

Lord Westbury, and that the relation between them is fiduciary was declared by him to be " an elementary principle of law."

Whether or not a surviving partner is inaccurately called a trustee does not matter. There is no magic in law in a name. It is not the name which determines his relation to the representative of the deceased partner, creates his duties, and measures his responsibility, but his dominion over the partnership property, and his obligations with respect to it. In him alone is vested the title and the right of possession, and to him alone belongs the power of its disposition, but subject to accountability for its proper disposition, to those interested. His obligations make it his duty, in the conversion of the property into money, to use every reasonable effort to obtain its value, in order that the debts may be paid, and a just surplus for distribution be realized. When seeking to purchase the interest of the deceased partner, instead of converting the assets into money and dividing the surplus, the relation that the surviving partner bears to the representative of the deceased partner is still in force, his obligations with respect to the assets still subsist, and they do not allow him to deal less frankly and justly. He cannot place the representative of the deceased partner at arm's length, and seek to obtain a profitable bargain for himself. Having generally a superior knowledge of the assets and their value, it is his bounden duty, in purchasing the interest of the deceased partner, to acquaint his representative with full information as to the assets, and the facts from which their value may be estimated or inferred. It is not sufficient that he does not withhold or conceal such information, but it is incumbent on him to disclose voluntarily all within his possession or knowledge from which a sound judgment as to the value of the interest may be formed. He cannot remain passive, but must make a frank and honest disclosure.

In *Sexton* v. *Sexton*, 9 Gratt. 215, it was stated that the appellant, (one of the partners) in selling his interest to the other

partner, was required to exercise the utmost good faith. Said Judge Daniel: "He was bound not only to disclose truly any information in his possession that might be called for, but if he perceived that the appellee (the buyer) was laboring under incorrect views in reference to the amount of the debt due by the concern, by which he might be misled into too high an offer for the interest to be sold, it was his duty to furnish all the data he might have, by which such views might be corrected, and the mischief prevented." If this be true in the case of a sale between the partners themselves, who are presumed to be, and generally are, well informed as to the business and condition of the partnership, how much greater is the necessity, and how much more is it the duty of a surviving partner, when seeking to purchase the interest of a deceased partner, to disclose truly to his representative, who is generally wholly ignorant of the affairs of the partnership, all information from which its value may be estimated. In the case before us, the personal representative was a woman, without experience of any sort in business, and the transactions of the firm were mainly carried on in foreign lands, the tobacco manufactured by the firm being sold almost exclusively in Australia, India, and other distant markets, so that it was next to impossible for her to obtain information essential to the formation of a correct opinion as to the value of the good-will and trade-marks, except from the surviving partner.

In *Heath* v. *Waters*, 40 Mich. 465, in which, like the case at bar, there was a controversy over the transfer by the representative of the deceased partner of certain assets of the firm to the surviving partner for inadequate compensation, the court said: "As surviving partner he possessed exclusively the means of determining just what the assets consisted of. It was his duty, before making any bargain or other dealing with the representative of Elijah's (the deceased partner) estate, to put her in as complete a condition of knowledge as himself. This would

necessarily include not only a statement of assets and liabilities, but such information concerning the business as would indicate the value and advantages of the concern. This duty would require him, in dealing with a woman not thoroughly familiar with such matters, to use additional care to prevent her from being deceived or imposed upon. A trustee cannot put himself at arm's length, and compel the beneficiary to protect himself. He is bound to protect her against his own imposition as well as against wrong from any other quarter. And the slightest pressure or unfairness would authorize her to complain. In the present case the fiduciary obligations were more extensive than usual. Complainant herself was acting in a fiduciary capacity, of which he was fully aware; and any dealing with her in the wrong of the estate would affect both parties with an equitable responsibility."

It was insisted that even if Dunlop, as surviving partner, occupied a fiduciary relation to the executrix of the deceased partner, he was released from the duty imposed by such relation as respects the matter in controversy by the intervention of competent and independent advice. There is no doubt that where a beneficiary in dealing with the trustee has sought and obtained independent advice from a person competent to advise as to the particular transaction, this fact will go far to give assurance of its fairness, and to induce a court of equity to uphold it. The foundation for the contention in this instance is the claim that the executrix had the advice of her brother-in-law, Mr. Baskerville, a man of affairs and large experience in business, and of her counsel, Mr. Mann. The evidence shows, however, that she never consulted either of them as to the advisability of selling the interest of her testator in the good-will and trademarks at the price offered by Dunlop, and, moreover, that when she did consult Mr. Baskerville, he told her that he did not know enough about the value of brands and labels to advise her, but that he considered Dunlop an honest man, and was sure that

he would not do anything that was not right. As to Mr. Mann, she only consulted him as to her right to sell to Dunlop, without an appraisement, at a price to be fixed by himself, and as to the form of the contract of assignment after the terms of the sale had been agreed upon between them. The claim of competent and independent advice is not sustained by the evidence, and Dunlop was not relieved from the duty imposed upon him by the relation he bore, as surviving partner, to the representative of the estate of his deceased partner.

Dunlop, having declined to continue the business in partnership with the executrix, wrote to her at Newport, R. I., on October 16, 1885, and offered to rent the factory from year to year, and to rent or buy her half of the fixtures at such price as competent persons might decide, the same having been given to her for life by the will of her husband. In this letter, he stated that he would buy the brands and good-will of the business at valuation. The executrix returned to her home in Petersburg, Va., on October 24, 1885. Between that date and November 10, 1885, they had several interviews in reference to the settlement of the business between them, and in all these interviews he assumed and claimed that the good-will and trade-marks survived to him as the surviving partner, but that he was willing, as a mere gratuity, to make her some compensation for them. On November 9, 1885, he submitted to her a proposition in writing for the purchase of the interest of the estate of D. B. Tennant in the fixtures, and for the rent of the factory and other property used in connection with the business, and offered to pay $1,000 for the good-will and trade-marks, but disclaimed any admission by such offer that they were not the property of himself, as surviving partner. He also offered verbally at the same time to pay $500 more for the "Shellard" brand. The executrix accepted his offer, and on the next day a formal contract of sale was drawn up, and the same executed by her.

As to his claim, as surviving partner, to the good-will and

trade-marks as of right, he was clearly mistaken.  Whatever may have been the earlier decisions of the courts upon this sub-ject, it is now the settled law that the good-will and trade-marks of a business are partnership property, and must be accounted for by the surviving partner the same as the other assets of the firm. Lindley on Part. 861; Pollock's Law of Part., Art. 57; 2 Bates on Part., secs. 658, 743; 26 Am. & Eng. Ency. of Law, 405; 1 Parson's Sel. Eq. Cas. 270; *Wedderburn* v. *Wedderburn*, 22 Beav. 84; *Bradbury* v. *Dickens*, 27 Beav. 53; *Smith* v. *Everett*, 27 Beav. 346; *Mellersh* v. *Keen*, 27 Beav. 236; *Willet* v. *Blan-ford*, 1 Hare, 253; *Hall* v. *Barrows*, 4 De G., J. & S. 150; *Sheppard* v. *Boggs*, 9 Neb. 257; *Dougherty* v. *Van Notrand*, 1 Hoff. Ch. R. 68; *Mnfg. Co.* v. *Hall*, 61 N. Y. 226; *Dwight* v. *Hamilton*, 113 Mass. 175; and *Rammelsburg* v. *Mitchell*, 29 Ohio St. 22.

He was not only mistaken as to his right thereto under the law, but the matter had been put beyond controversy by the articles of co-partnership.  By them it was specifically provided that any and all brands brought into the business by either part-ner should be his property at the expiration of the partnership, and all new brands established by the partnership should be considered, held, and treated as partnership property.  At the time of the transfer of the good-will and trade-marks to Dunlop by the executrix, the existence of the articles of co-partnership was unknown to her.  She was not only unaware of them, but Dunlop had declared to her that he and her husband had not had any written contract of partnership after the first years, but merely a verbal contract from year to year.  So that his position, as to his right to the good-will and trade-marks, was not only contrary to law, but contrary to the express provisions of the written agreement by which the partnership was created.  He stated to her incorrectly both the law and the facts.

There is no room for mistake or doubt as to his position, when obtaining from the executrix a transfer of the interest of her

testator in the good-will, brands, and labels. He confirms it by his answer to the original bill, in which he asserts that " he never imagined that he was purchasing from the executrix a part of the assets belonging to her testator's estate, but looked upon the transaction in the light of a gratuitous allowance by him to the estate of his deceased partner of the amount of $1,500 for a privilege which belonged to him as surviving partner, by operation of law, and which might prove of some benefit to him, but for which the estate of D. B. Tennant had no legal claim against him whatever."

He not only claimed that the good-will and brands belonged to him, as surviving partner, but stated to the executrix that the brands were not so valuable as they had been, because customers, when sending orders for tobacco, sent with their orders, more than formerly, brands or labels of their own to be put on the tobacco. This was deposed to by the executrix, and admitted by Dunlop. The evidence shows that in making this statement he was again mistaken, and that the fact was just the other way. From a paper filed by him in answer to a question as to the number of brands used by the firm of D. B. Tennant & Co., at or about the time of its dissolution, and which shows a list of the brands of the firm and also of brands used by the firm in manufacturing tobacco for persons by whom they were owned, which last-named brands are called " proprietary brands," it appears that twenty-nine of these proprietary brands were used by the firm in 1883, twenty-four in 1884, and nineteen in 1885, the year that Tennant died. The number of pounds of tobacco manufactured under them in 1883 was 284,379; in 1884, 178,583; and in 1885, 178,102. It thus appears that there was a steady *decrease* both in the number of proprietary brands used, and in the amount of tobacco manufactured under them. But this is not all. It shows also a remarkable *increase* in the quantity of tobacco manufactured under the firm brands during these same years. Thus, there was manufactured

under these brands 693,315 pounds in 1883; 1,055,758 pounds in 1884; and 1,256,751 pounds in 1885. It is, therefore, apparent that the statement of Dunlop that the use of proprietary brands was increasing was contrary to the fact, and calculated to mislead the executrix, and produce in her mind the erroneous impression that the more frequent use of proprietary brands was rendering the firm brands less and less valuable.

As heretofore stated, the law required him, in purchasing the good-will and trade-marks, to put the executrix in as complete a condition of knowledge as himself. It was his duty to impart to her all information possessed or known to him as to their value. So far from performing this duty, he omitted to do so; and not only omitted to do so, but persistently asserted that the good-will and trade-marks belonged to him as surviving partner, and that the estate of the deceased partner had no interest in them.

In negotiating with her for the purchase, he took the erroneous position that, being surviving partner, they were already by reason thereof his property, and that he was simply making a gratuitous allowance for any right supposed by her to belong to the estate of her testator. It is not natural, nor consonant with reason, that a sum of money given under these circumstances would even approximate their value. One does not give value for property as a gratuity.

Nor was he less mistaken in imparting to her information as to the value of the brands and labels. They were not becoming less but more valuable. He was still less likely to offer a fair price for them under the statement, which was contrary to the fact, that they were diminishing in value.

The presumption is, therefore, strong that the price paid was much below their real value. Not only is this the presumption under the circumstances, but the evidence is abundant that the price paid was inadequate.

It was argued in behalf of Dunlop, that the law did not au-

thorize a sale of the good-will and trade-marks separately from the business as a going concern, or at least that they could only be sold along with the business and book debts. There are expressions in some of the cases, especially in the English cases, to the effect that the most advantageous mode of disposing of the good-will and trade-marks is to sell the same and the book debts together, not, however, as we understand those cases, that a valid sale cannot be made of the good-will and trade-marks separately from the plant and property of the business and the book debts, but because the possession of the debts would introduce the purchaser to the customers of the former owners of the business, enabling him to retain their custom, and augmenting the value of the good-will, and thus constitutes an additional inducement to the purchase of the good-will and trade-marks, whose value the retention of the debts and their forced collection by the surviving partner, who would have no interest in the future business, would tend to impair. It was, therefore, contended that as they could not be sold separately from the debts, and the sale of the debts for obvious reasons would have been inexpedient, if not disastrous, to the late firm, the only proper course was the one that was pursued.

That the good-will of a business and trade-marks, of the character under consideration, which are incidents of the business and not of the place of business or plant, with the right to use the latter in the manufacture or sale, as the case may be, of the merchandise to which they have been attached, may be sold separately from the plant or property, and also from the book debts, is, we think, not only sustained by the authorities, but is in accord with the tendency of the law, which is yet in a state of evolution, upon the subject of trade-marks, and their growing importance and increasing value in the commercial world.

In Browne on Trade-Marks, section 362, the law is thus stated: "A property in a trade-mark may be obtained by transfer from him who has made the primary acquisition, though it is essential

that the transferee should be possessed of the right either to manufacture or sell the merchandise to which the trade-mark has been attached."

In *Julian* v. *The Hoosier Drill Co.*, 78 Ind. 408, which was a suit by the assignee of a trade-mark to recover damages for an infringement thereof, one of the defences relied on was that there was no valid assignment of the trade-mark. The assignor had devised and adopted the word "Hoosier" as a trade-mark on certain grain drills manufactured and patented by him, and subsequently transferred and assigned to the complainant the letters-patent, and also the right to and property in said trade-mark.

"The assignment and transfer," said the court, "carried with it to the assignee the exclusive right to manufacture and sell the grain drill specified in the letters-patent, and to carry on the business of making and selling the same. It was a transfer to appellant of the *right* to carry on the business in which Joseph Ingles had been engaged, and in connection with which he had used said trade-mark. * * * * The assignment, and the right to make it, did not, in any way, depend upon the time at which the appellant might engage in business. Nor was it necessary to the validity of the transfer of the trade-mark that the place of business or drills actually manufactured should be transferred. It was enough, if the right to engage in the business was assigned. As incident to the assignment of this right, it was quite competent to assign the right to the trade-mark."

In *The Dixon Crucible Co.* v. *Guggenheim*, 3 Am. L. T. R. 288; s. c. 2 Brewster, 321, Judge Paxson, after citing the authorities and stating that property in trade-marks may be obtained from him who has made the primary acquisition, said: "The true rule to be deduced from these cases would appear to be this: That the property or right to the trade-mark may pass by an assignment or by operation of law to any one who takes at the same time the right to manufacture or sell the particular mer-

chandise to which said trade-mark has been attached." And to the same effect are the following: 17 Am. & Eng. Ency. Law, 1187; 26 *Id.* 383; *Bradbury* v. *Dickens*, 27 Beav. 53; *Royal Baking Powder Co.* v. *Raymond*, 70 Fed. Rep. 376; *Godillot* v. *The American Grocery Co.*, 71 Fed. Rep. 873; and *Walton* v. *Crowley*, 3 Blatch. 440.

But it was further contended that, conceding that the good-will and trade-marks may be sold separately from the property of the business and the book debts, yet the surviving partner, having the right to carry on a similar business in competition with the purchaser, though not in the old name, nor as the successor of the old firm, no one would buy the good-will and trade-marks under these circumstances, and that consequently they had no value beyond what the executrix of the deceased partner could induce the survivor to pay for them. We would be loth to hold that the measure of accountability was wholly arbitrary, and was only what the surviving partner might choose to give, although the value was really much greater. But, aside from this, whether any one would have given more or not than Dunlop paid is merely conjectural. It is not capable of proof or demonstration. There was no trial to ascertain this. The good-will and brands were not offered for sale to the public. No one but Dunlop was given an opportunity to buy. There was no competition, and no valuation. The contention that no one would have bid at all under the circumstances, or given more than Dunlop, rests wholly within the domain of opinion. It has no other or more substantial foundation. Dunlop acquired from the executrix of the deceased partner the interest of his estate in the good-will and brands at apparently a greatly inadequate sum, when he should have paid the fair value thereof, and the complainants are now entitled to recover for the *devastavit*.

Under the circumstances shown, and in view of the relation that a surviving partner bears to the representative of a deceased partner, the mistaken claim of right by Dunlop to the said assets,

and of his erroneous statement that proprietary brands were more used than formerly, it was plainly incumbent upon him to prove that the price paid by him was all that the interest of the estate of Tennant in the good-will and trade-marks was worth. This he did not even attempt. He introduced no testimony, nor testified himself, except indirectly, as to their value; while, on the other hand, the complainants produced abundant evidence tending to show that the price paid was very inadequate.

It is next to be considered what is the proper relief to be given. Shall the transfer of the good-will and brands and labels stand, and Dunlop be required to pay adequate compensation, or must the sale be rescinded, the property sold at public auction, and the proceeds divided between him and the estate of Tennant, and the profits which have been realized from the use of the brands since the purchase be ascertained, and likewise distributed?

The court is of opinion that, under the circumstances of the case, the proper relief to be given is adequate compensation according to the value of the good-will and trade-marks at the dissolution of the firm. Where a surviving partner is not the representative, nor one of the representatives, of the deceased partner, he is not interdicted from contracting with such representative; and if by agreement with such representative he has acquired the interest of the deceased partner for an inadequate consideration, through some mistake of fact, or obtained the transfer of some asset of the firm under a mistaken claim of right, wherefore right and justice call for redress, the proper relief, in the absence of all fraud, is the real value of the interest or asset. This measure of relief satisfies the legal right of the estate of the deceased partner. It restores to it all that it was originally entitled to, repairs fully the injury, and leaves no just ground of complaint.

The nature and extent of the relief granted, where the purchase was made or the transfer obtained without fraud, should not be such as to deter a surviving partner from purchasing the interest of a deceased partner in the property of the partner-

ship, for a purchase by the survivor of the unascertained share at a just valuation is often, if not generally, the best method to obtain its value, and to prevent the ruinous consequences likely to result both to the survivor and to the estate of the deceased partner by the forced conversion of the assets into money.

In a case where the survivor has continued the business and used the assets of the firm, and it is plainly just that he should be made to account for profits—so many elements, labor, skill, foresight, and other personal qualities, and fortunate business connections, as well as capital, combine to create profits—that it is often most difficult to estimate with any degree of accuracy the proportion of profits to be attributed to capital and what to other elements; and any estimate is at best conjectural, and liable to do injustice.

Therefore, our conclusion is, upon a careful consideration of the whole case, to reverse the decree of the Circuit Court, and remand the cause, with directions to the court to ascertain the value of the interest of the deceased partner at the dissolution of the firm in the good-will, brands, and labels purchased from his executrix by the surviving partner, and to decree that the appellee, Dunlop, pay the same to the complainants, subject to a credit for the amount paid to the executrix by him for the said property, with interest on the balance from January 1, 1886, to which period the partnership was extended by agreement between him and the executrix to enable him the better to wind up the business without loss.

*Reversed.*