## PH. SCHNEIDER BREWING CO. v. CENTURY DISTILLING CO.

### No. 1901.

Circuit Court of Appeals, Tenth Circuit.

Oct. 24, 1939.

Albert J. Fihe, of Chicago, Ill., and Harry S. Silverstein, of Denver, Colo., for appellant.

Edward S. Rogers of Chicago, Ill. (Frank T. Miller and Val C. Guenther, both of Peoria, Ill., William T. Woodson and James H. Rogers, both of Chicago, Ill., and Wm. V. Hodges, Henry C. Vidal, and Joseph G. Hodges, all of Denver, Colo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

PHILLIPS, Circuit Judge.

Philip Freiler was engaged in the wholesale liquor business at Elgin, Illinois, from 1883 to 1914. During that period he purchased whiskey from distillers and sold it at wholesale under the trade-mark "Century Club." On March 19, 1907, Freiler registered the mark "Century Club" for distilled alcoholic liquors on an application filed April 20, 1905. Elgin became dry

territory under local option in 1914 and Freiler discontinued his wholesale liquor business. He sold all his merchandise, labels, and advertising matter to Henry A. Klein, of Chicago, for a valuable consideration. It does not appear that any written assignment of the registered mark was made to Klein. Klein continued the business at Chicago under the name of the Freiler Company from 1914 to the advent of national prohibition in 1919. He employed salesmen who had worked for Freiler, advised the trade by letter that he had taken over the Freiler business, and used the mark "Century Club" on whiskey sold under the trade name Freiler Company. He also sold other brands under other trade names. Freiler's registration expired in 1927 and was not renewed. After the adoption of the Twenty-First Amendment to the Constitution of the United States, U.S.C.A., Klein again engaged in the wholesale liquor business through the Liquor Dealers Supply Company,[1] an Illinois corporation, the stock of which was owned by Klein, his wife, and his son, and continued to use the mark "Century Club." Twenty-five separate invoices of the Supply Company covering the sales of Century Club whiskey to its customers in May, 1934, were introduced in evidence. The Supply Company purchased the whiskey which it sold under that mark from the Century Distilling Company.[2] No formal assignment of the mark "Century Club" was made by Klein to the Supply Company, but he impliedly consented to its use by the Supply Company. On July 10, 1934, the Supply Company registered the trade-mark "Century Club" for whiskey and gin on an application filed April 3, 1934. In its statement the Supply Company claimed use of the trade-mark by it and its predecessors from May 1, 1883.

Century Company was organized under the laws of Illinois on November 1, 1933. It built a modern distillery at Peoria, Illinois, completing it in January, 1934, and engaged in the distillation of whiskey, gin, and other alcoholic liquors.

On July 25, 1934, the Supply Company, by written assignment, transferred to the Century Company its registered mark "Century Club" and the good will associated with that mark.

Ph. Schneider Brewing Company,[3] a Colorado corporation, is engaged in the manufacture and sale of beer at Trinidad, Colorado. In 1908 it adopted the word "Century" as a trade-mark for beer and used it continuously from that date until 1916, when the state of Colorado became dry territory. From 1916 until 1933 the Schneider Company used the mark "Century" on nonalcoholic cereal malt beverages containing less than one-half of one per cent of alcohol by volume, commonly called "near beer." On August 9, 1932, the Schneider Company registered the mark "Century" for nonalcoholic cereal malt beverages containing less than one-half of one per cent of alcohol by volume on an application filed July 11, 1928. Since 1933 the Schneider Company has continuously used the name "Century" as a trade-mark for beer.

Since 1934 the Century Company has carried on a nation-wide business in whiskey, gin, and other distilled alcoholic beverages identified by the mark "Century." Its products are well known and highly esteemed by the trade and public in general. Its sales have aggregated in excess of $3,000,000. It expends $150,000 annually in advertising its brands "Century" and "Century Club," and those brands are well known throughout the United States.

Since 1908 the Schneider Company has expended the sum of approximately $30,000 annually in advertising "Century" beer and "Century" near beer.

On April 13, 1936, the Century Company applied to the United States Patent Office for registration of the trade-mark "Century" for gin. The Patent Office placed the application in interference with the registration of the Schneider Company of the mark "Century" for nonalcoholic cereal malt beverages. On May 17, 1938, the Examiner of Interferences decided the interference in favor of the Schneider Company. The decision of the Examiner of Interferences was affirmed by the Assistant Commissioner of Patents on October 28, 1938. Thereafter, counsel for the Schneider Company wrote letters to a number of the Century Company's customers in Wyoming and Colorado asserting that the

---

[1] Hereinafter referred to as the Supply Company.

[2] Hereinafter referred to as the Century Company.

[3] Hereinafter referred to as the Schneider Company.

Schneider Company owned the mark "Century"; that the Century Company's use of the word "Century" on whiskey and gin infringed the Schneider Company's mark, and threatened suit against such customers unless they discontinued selling Century Company's goods labeled "Century" or "Century Club."

The Century Company does not now and never has engaged in the manufacture or sale of cereal malt beverages, and the Schneider Company does not now and never has engaged in the manufacture or sale of distilled alcoholic liquor.

The Century Company brought this suit against the Schneider Company to establish its right to use the mark "Century" on distilled alcoholic beverages and to enjoin the Schneider Company from interfering or attempting to interfere with such use. The Schneider Company filed an answer and cross-bill in which it sought to establish its exclusive right to use the mark "Century" on alcoholic beverages, including beer, whiskey, and gin, and to enjoin the Century Company from using the mark "Century" or any colorable variation thereof.

At a pretrial conference a stipulation was entered into which reads in part as follows:

"The first user of the trademark 'Century' or 'Century Club' for distilled alcoholic liquors was Philip Freiler of Elgin, Illinois, who used 'Century Club' on whiskey as early as May 1, 1883, and established it as a well known brand which had a wide distribution primarily in the states of Illinois, Wisconsin, Minnesota, Iowa, Indiana and Michigan. He continued its use on whisky until the year 1914 when the City of Elgin voted dry under local option and he was compelled to discontinue the liquor business there. * * *

"By reason of plaintiff's wide use and exploitation of the trademarks 'Century' and 'Century Club' in connection with whisky, gin and alcohol, said trademarks, as applied to such products, are the means by which they are identified and distinguished by the trade and public from whisky, gin and alcohol produced by others; and as to whisky, gin and alcohol, the trademarks 'Century' and 'Century Club' refer and are understood by the trade and public to refer only to plaintiff's goods."

The following is a label used by the Century Company and is typical of the other labels used by that company:

It will be observed that the name and location of the Century Company prominently appear on the label.

The following is a label used by the Schneider Company and is typical of the other labels used by that company:

It will also be observed that the name and location of the Schneider Company prominently appear on the label.

The labels used by the two companies bear no resemblance, except both employ the word "Century."

The trial court found the facts as above stated. It entered a decree by which it adjudged that the Century Company is the owner of the mark "Century" as applied to distilled alcoholic beverages, including whiskey, gin, and alcohol, and is entitled against the Schneider Company to the exclusive use of the mark "Century" as ap-

plied to distilled alcoholic beverages, and that the goods of the Century Company are distinguished from other goods of the same class by that mark, and enjoined the Schneider Company from interfering or attempting to interfere with the Century Company's use of the mark "Century" in connection with distilled alcoholic beverages, and from interfering with Century Company's registration of the mark "Century Club" for whiskey and gin. It dismissed the cross-bill of the Schneider Company. The Schneider Company has appealed.

■ A trade-mark is a right appurtenant to a business or trade in connection with which the mark is employed. The right to a particular mark grows out of its use. Its function is to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his. United Drug Co. v. Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141.

■ The United States statutes, 15 U.S. C.A. § 81 et seq., providing for the registration of trade-marks and the assignment of registered trade-marks neither confer nor limit substantive rights. They merely confer certain procedural advantages to the registrant. The substantive rights are determined wholly by common-law principles.[4] Registration does not create a trade-mark; neither is it essential to its validity. Armour & Co. v. Louisville Provision Co., 6 Cir., 283 F. 42, 45.

■ 15 U.S.C.A. § 90 provides for the assignment of a registered trade-mark by an instrument in writing duly acknowledged. It follows that the sale from Freiler to Klein did not pass Freiler's registered trade-mark. But Freiler's common-law right will be presumed to have passed without formal assignment, absent contrary evidence, with the sale and transfer to Klein of the business with which the mark had been identified.[5]

■ When Klein organized the Supply Company in 1933 as a family corporation, it continued the use of the mark with the implied consent of Klein and acquired the equitable right to the use of the mark, although no formal transfer was made from Klein to the Supply Company.[6]

■ It may be stated as a general rule that a trade-mark may not be assigned in gross. It cannot be assigned separate and apart from the good will with which it is associated. But where the mark only identifies a portion of the goods sold by a particular trader who is not the manufacturer thereof, the mark may be assigned, along with the good will associated with the goods which the mark identifies, to a person who will continue to sell the same goods, without a transfer of the remainder of the business or the physical plant of the assignor.[7]

[4] Pulitzer Pub. Co. v. Houston Printing Co., D.C.Tex., 4 F.2d 924, 926;

Anheuser-Busch, Inc., v. Cohen, D.C. Md., 37 F.2d 393, 396;

In re Plymouth Motor Corp., Cust. & Pat.App., 46 F.2d 211, 212;

Andrew Jergens Co. v. Woodbury, Inc., D.C.Del., 273 F. 952, 965; Id., 3 Cir., 279 F. 1016.

[5] United States Ozone Co. v. United States Ozone Co. of America, 7 Cir., 62 F.2d 881, 885;

Replogle v. Airway Co., 52 App.D.C. 364, 287 F. 765, 767;

Woodward v. White Satin Mills Corp., 8 Cir., 42 F.2d 987, 989.

[6] Solis Cigar Co. v. Pozo, 16 Colo. 388, 26 P. 556, 558, 25 Am.St.Rep. 279;

Menendez v. Holt, 128 U.S. 514, 522, 9 S.Ct. 143, 32 L.Ed. 526;

Brown Chemical Co. v. Meyer, 139 U.S. 540, 548, 11 S.Ct. 625, 35 L.Ed. 247.

[7] A. Bourjois & Co., Inc., v. Katzel, 260 U.S. 689, 692, 43 S.Ct. 244, 67 L.Ed. 464, 26 A.L.R. 567;

Tennant v. Dunlop, 97 Va. 234, 33 S.E. 620, 626;

Witthaus v. Braun, 44 Md. 303, 306, 22 Am.Rep. 44.

See, also, The Assignment of Trade-Marks and Trade Names by Mr. Grover C. Grismore, Mich. Law Rev., Vol. 30, No. 4, p. 489.

In Tennant v. Dunlop, supra, the court said:

"That the good will of a business and trade-marks of the character under consideration, which are incidents of the business, and not of the place of business or plant, with the right to use the latter in the manufacture or sale, as the case may be, of the merchandise to which they have been attached, may be sold separately from the plant or property, and also from the book debts, is, we think, not only sustained by the authorities, but is in accord with the tendency of the law, which is yet in a state of evolution, upon the subject of trade-marks, and their growing importance and increasing value in the commercial world.

"In Browne, Trade-Marks, § 362, the law is thus stated: 'A property in a trade-mark may be obtained by transfer

■ The trade-mark "Century Club" was associated with a particular brand of whiskey first sold and distributed by Freiler and later by Klein and the Supply Company. Freiler, Klein, and the Supply Company were not manufacturers of liquor. They were wholesalers of whiskey which they purchased from distillers. They used the mark to identify a particular whiskey and built up a good will therefor in the states of Illinois, Iowa, Wisconsin, Michigan, Minnesota, and Indiana. The good will and mark were associated with that particular whiskey. They were not connected with other distilled liquors sold by Freiler, Klein, and the Supply Company under other brands. Sales were suspended during the period of national prohibition, but after the adoption of the Twenty-First Amendment, Klein, through the Supply Company, in May and June, 1934, again sold whiskey identified by the mark "Century Club" and the Supply Company registered "Century Club" as a trade-mark. At the time of the transfer of the mark to the Century Company the Supply Company had an established wholesale liquor business. As a part thereof it was selling a certain whiskey which it identified by the mark "Century Club" and which was manufactured by the Century Company. No doubt, the good will established in respect to that whiskey and that mark prior to national prohibition in some degree inured to the Supply Company and was increased by its sales in 1934. The Supply Company assigned that good will and the mark which identified the goods associated therewith to the Century Company, the manufacturer of such goods. The goods are still manufactured at the same place and by the same person and the mark still identifies those particular goods. There is no misrepresentation to the public. Under the circumstances, we see no legal objection to the transfer of the mark to the Century Company, together with the good will associated therewith, although the Supply Company retained the remainder of its business and the good will associated therewith.

We conclude that the assignment from the Supply Company to the Century Company was valid and carried with it the common-law right acquired in the mark, first by Freiler, and later by Klein and the Supply Company.

■ Finally, we are of the opinion that no confusion of goods is likely to result from the use by the Century Company of its labels employing the word "Century" on distilled alcoholic liquors, and the use by the Schneider Company of its labels employing the word "Century" on cereal malt beverages. The test is whether the similitude in the labels would probably deceive a purchaser who exercises ordinary prudence, not the careless buyer who makes no examination.[8] There is no similarity in the two labels and the name of the manufacturer is prominently displayed on each label. It is inconceivable to us that an ordinary purchaser examining the Century Company labels and the Schneider Company labels would be deceived.

The decree is affirmed.

from him who has made the primary acquisition, though it is essential that the transferee should be possessed of the right either to manufacture or sell the merchandise to which the trade-mark has been attached.' "

In Witthaus v. Braun, supra, the court said:

"The *mere sale* of a trade-mark *apart from the article to which it is affixed*, confers no right of ownership, because no one can claim the right to sell his goods, as goods manufactured by another. To permit this to be done, would be a fraud upon the public. But where as in this case, the trade-mark is assigned *to the person who manufactured the tobacco*, to which the trade-mark was affixed, there is no false representation to the public, because the tobacco is still manufactured at the same place, and by the same person. It is in fact, the same article."

[8] A. Leschen & Sons Rope Co. v. Fuller, 8 Cir., 218 F. 786;
Turner & Seymour Mfg. Co. v. A. & J. Mfg. Co., 2 Cir., 20 F.2d 298;
American Tobacco Co. v. Globe Tobacco Co., C.C.Mich., 193 F. 1015;
63 C.J. p. 400, note 60.