**LaTOURAINE COFFEE CO., Inc., v. LOR-RAINE COFFEE CO., Inc., et al.**

**No. 300, Docket 20224.**

Circuit Court of Appeals, Second Circuit.

Aug. 7, 1946.

Writ of Certiorari Denied Nov. 12, 1946.

See 67 S.Ct. 189.

FRANK, Circuit Judge, dissenting.

———◆———

Benjamin P. DeWitt, of New York City (Sidney Pepper, of New York City, on the brief), for appellant.

James A. Dilkes, of Staten Island, N. Y. (Sidney Jacobi, of Staten Island, N. Y., on the brief), for appellees.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Plaintiff, a Massachusetts corporation doing business in New York, has brought this action to enjoin infringement of its registered trade-mark and to enjoin unfair competition. Plaintiff and its predecessor corporation have employed the name "La-Touraine" in connection with coffee, tea, and chocolate powder sold by them, beginning as to coffee in 1906, as to tea in 1918, and as to the powder in 1937. Through a broad and varied program of advertising, they have attained a position of eminence in the industry, selling some fifteen million pounds of coffee alone each year. The corporate defendant is a small New York family corporation, organized by the individual defendant in 1944 and engaged in selling coffee and tea throughout Staten Island, New York, and northern New Jersey. From a judgment of the lower court holding the trade-mark valid, but not infringed, and finding no unfair competition, plaintiff appeals.

■ Before considering the question of infringement, we must dispose of defendants' very vigorous contention that plaintiff does not have a valid technical trade-mark in any case, because the word "Touraine" is geographical. Congress denied registration of geographical terms only in those cases where the name adopted is "merely geographical." 15 U.S.C.A. § 85 (b). Its purpose was obviously to codify the common-law rule which prevented one manufacturer from appropriating to his own use a name so generically descriptive that it might be employed with equal propriety by others. "Could such phrases as 'Pennsylvania wheat,' 'Kentucky hemp,' 'Virginia tobacco,' or 'Sea Island cotton,' be protected as trademarks; could any one prevent all others from using them or from selling articles produced in the districts they describe under those appellations,— it would greatly embarrass trade, and secure exclusive rights to individuals in that which is the common right of many." Delaware & H. Canal Co. v. Clark, 13 Wall. 311, 324, 80 U.S. 311, 324, 20 L.Ed. 581. See also Columbia Mill Co. v. Alcorn, 150 U.S. 460, 14 S.Ct. 151, 37 L.Ed. 1144; Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; American Wine Co. v. Kohlman, 5 Cir., 158 F. 830. The courts have consistently held, however, that, when the name is used in an "arbitrary" or fictitious sense, it may be the subject of a valid trade-mark. Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (The American Girl shoe); McIlhenny Co. v. Gaidry, 5 Cir., 253 F. 613 (Tabasco sauce); Century Distilling Co. v. Continental Distilling Corp., D.C.E.D.Pa., 23 F.Supp. 705, modified 3 Cir., 106 F.2d 486, certiorari denied 309 U.S. 662, 60 S.Ct. 581, 84 L.Ed. 1010 (Dixie Belle and Dixie Beau liquor); Fleischmann v. Schuckmann, 62 How.Prac., N.Y., 92 (Vienna bread).

This judicial construction has received legislative approbation. The Trade Mark Act of July 5, 1946, Pub.L.No.489, c. 540, 79th Cong., 2d Sess., § 2(e) (2), 15 U.S.C.A. § 1052(e) (2), effective one year hence, provides specifically that the use of geographical terms prevents registration if *"when applied to the goods of the applicant"* it "is primarily geographically descriptive or deceptively misdescriptive." (Emphasis added.) And application of the established principles compels a conclusion of validity here. The word "Touraine" itself is no longer a geographical name, since the ancient French province, existing until 1789, then was incorporated in substance into the Department of Indre-et-Loire. 11 Encyc. Americana 575; 26 id. 719; 22 Encyc. Britannica, 14th Ed., 325; Century Atlas of the World, 80. And admittedly that word is not the plaintiff's symbol. It has always used the prefix "La" as a part of its trade-mark. Moreover, its trade-mark registration, as well as its own certificate of incorporation, shows the combination as a single word "LaTouraine"; and this, according to its testimony, is its actual mark. True, defendants did call attention to certain instances of use otherwise. But whether these had become habitual or were mere careless misquotations, the differences noted above from the ancient French name are quite sufficient to avoid a deceptive misdescription of the goods. A. Bauer & Co. v. Siegert, 7 Cir., 120 F. 81, 84; Havana Commercial Co. v. Nichols, C.C.S.D.N.Y., 155 F. 302. The registered term neither has nor professes to have any relation to the source of its coffee, the place of manufacture, or the place of sale. It is an entirely arbitrary name. Obviously the legal principle should be employed to effectuate its purpose; it should not be made a mere contrivance to destroy an otherwise impregnable and successful trade-mark.

To establish infringement, plaintiff need show only that the name adopted by defendants is so similar to its trade-mark as to be likely to cause confusion among reasonably careful purchasers. Defendants urge that there has been no showing of actual instances of confusion; but no such evidence is required. George W. Luft Co. v. Zande Cosmetic Co., 2 Cir., 142 F.2d 536, certiorari denied 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606; Rice & Hutchins, Inc., v. Vera Shoe Co., 2 Cir., 290 F. 124. Small metropolitan restaurants constitute the trade of both companies in this area; and the owners of or purchasers for such establishments should not be held to a higher than usual standard of discrimination in purchasing. The only question is whether or not the similarity of names is such as to make likely the deception of any appreciable number of ordinary prudent customers.

While the trial judge, emphasizing the dissimilarity in size of the two businesses, concluded otherwise, we are constrained to think it is. As the cases cited below show, this is a question reviewable on appeal. Defendants have attempted to distinguish "Lorraine" from "LaTouraine" on the basis of the number of letters and syllables in the words, but this form of technical gymnastics is not determinative. See Celanese Corp. of America v. E. I. Du Pont De Nemours & Co., Cust. & Pat. App., 154 F.2d 143. The initial letters and the last syllables—probably the parts of any word which impress themselves most firmly upon the memory—are identical. The similarity is, of course, most striking in oral speech; a call for one in a store is likely to produce the other. Except on the tongues of precisionists, both sound alike; both are unmistakably French.

In this area of trade-mark law, each case must be considered separately and precedents are not conclusive. But examination of the cases gives some standard of similarity; and they indicate that here the degree of resemblance is rather greater than that in several cases where infringement has been found. See, for example, George W. Luft Co. v. Zande Cosmetic Co., supra (Tangee and Zande); Industrial Rayon Corp. v. Dutchess Underwear Corp., 2 Cir., 92 F.2d 33, certiorari denied Dutchess Underwear Corp. v. Industrial Rayon Corp., 303 U.S. 640, 58 S.Ct. 610, 82 L. Ed. 1100 (Spun-lo and Sunglo); Florence Mfg. Co. v. J. C. Dowd & Co., 2 Cir., 178 F. 73 (Keepclean and Sta-Kleen); Northam Warren Corp. v. Universal Cosmetic

Co., 7 Cir., 18 F.2d 774 (Cuticlean and Cutex); Gehl v. Hebe Co., 7 Cir., 276 F. 271 (Hebe and Meje); National Biscuit Co. v. J. B. Carr Biscuit Co., 55 App.D.C. 146, 3 F.2d 87 (Uneeda and Eta).

As further support for its claim for injunctive relief, plaintiff urges that Eben selected the name "Lorraine" well aware of the similarity and with the express purpose of deceiving the purchasing public. On this issue the court below has found against it. Were this a controlling issue here, we should find some embarrassment in accepting these findings notwithstanding that under Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A. following section 723C, they must stand unless clearly erroneous, for they do seem to call for a belief in Eben's naiveté which is hard to achieve. The record shows that for three years before starting his own business he was a salesman for a competitor of LaTouraine, during which time he never even heard of the name or knew there was such a brand of coffee. As Judge Learned Hand put it in a similar case, this calls for "stretching credulity beyond its breaking point." Ramopa Co. v. A. Gastun & Co., D.C.S.D. N.Y., 278 F. 557, 558. Further, his former employer testified under subpoena that he had even discussed plaintiff with Eben as "one of our toughest competitors." And his own explanation of the choice of "Lorraine" was, to put it mildly, fanciful. He said that he had made this selection because he had travelled in Alsace-Lorraine and had had some minor business dealings there and because a friend had just had a baby to whom he had given the name. Actually the baby, born more than two years before, bore the name of Eve Lorraine. And there were other small discrepancies in his story.[1] As a matter of fact the court did not analyze this testimony or mention, even to repudiate, the detailed testimony of Eben's former employer;[2] and we might well return the case for a discussion of this evidence and for an answer to the question how a coffee salesman could avoid all knowledge of a large competitor for three years. But, as the case stands, the question is not of controlling importance, for when similarity is established, good faith—even if proven—is no defense. Thaddeus Davids Co. v. Davids, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; Coty, Inc., v. Parfums De Grande Luxe, 2 Cir., 298 F. 865, certiorari denied Parfums De Grande Luxe v. Coty, Inc., 266 U.S. 609, 45 S.Ct. 94, 69 L.Ed. 466; Gehl v. Hebe Co., supra.

The Supreme Court has pointed out the law's recognition of "the psychological function of symbols" in protecting trademarks, adding that once the owner has impregnated "the atmosphere of the market with the drawing power of a congenial symbol" then the owner can obtain redress "if another poaches upon the commercial magnetism of the symbol he has created." Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381. True, the trade-mark is a species of monopoly, towards which the present climate of opinion is frigid, Standard Brands v. Smidler, 2 Cir., 151 F.2d 34, 38, though a monopoly of the words "LaTouraine-Lorraine" for the coffee-bean hardly seems world-shattering. Be that as it may, Congress has shown its continued interest in trade-mark protection by the comprehensive new codification of trade-mark law embodied in the Trade Mark Act of July 5, 1946, which not merely amplified the Act of 1905, 15 U.S.C.A. § 81 et seq., but gave to this property right a legislative standing it had not had before. Derenberg, Trade-Marks Ante Portas, 52

---

[1] Such as the original assertion that the girl's father was joining him in the new business, which he later modified to the claim that for a few months the father purchased coffee from him for resale. This person was not produced as a witness, because he was said to be suffering from "grippe" or a "severe cold."

[2] The findings were not filed until sometime after the memorandum of opinion—a practice often criticized. United States v. Forness, 2 Cir., 125 F.2d 928, 942, 943, certiorari denied City of Salamanca v. United States, 316 U.S. 694, 62 S.Ct. 1293, 86 L.Ed. 1764; City of New York v. McLain Lines, 2 Cir., 147 F.2d 393, 395; United States v. Crescent Amusement Co., 323 U.S. 173, 185, 65 S.Ct. 254, 89 L.Ed. 160. The trial court's preoccupation with the relative magnitude of the businesses is noted below.

Yale L.J. 829, 830. We should hesitate to go against so clearly expressed a legislative intent for only some remote fears of our own of social disaster to result from grant of the statutory protection. The new statute affords relief for a "colorable imitation" where use is "likely to cause confusion or mistake or to deceive purchasers as to the source of origin of such goods," § 32(1) (a), Act of July 5, 1946; and all the courts and judges hearing the Mishawaka case were agreed as to the need of at least injunctive relief to avoid confusion. Thus the dissenting justices say, 316 U.S. 203, 208, 62 S.Ct. 1022, 1025, 86 L.Ed. 1381: "In any event, the economic rivalry, if it existed at all, was so remote and indirect that *an injunction alone would seem to have afforded ample relief* against the infringement, found by both courts below to have been without fraudulent intent." (Emphasis added.)

Here the only question involved is that of injunctive relief. The District Judge seems to have been greatly impressed by the defendant's small size, business-wise; he refers several times to this or to the plaintiff's "large" or "flourishing" business and the lack of a showing of sufficient grounds to put defendant Eben "out of business" or to prevent him "from doing business." Even so, one cannot ride upon another's coattails in the inevitable process of becoming bigger; and, at least as the law now stands, one cannot grow through use of another's congenial symbol. And there is no question of destroying a business; here defendant had chosen a name, on his own story as a flight of fancy without connection with himself, his family, or the coffee trade, and had used it at the utmost for some six months when he was warned of the consequences. We think under the circumstances that imagination can soon suggest a worthy substitute.

The judgment is reversed and the action is remanded for the award of injunctive relief.

---

1 It is not mentioned by my colleagues.
2 Whether, having found no infringement, he could properly hold the trademark valid, is indeed doubtful. See Cover v. Schwartz, 2 Cir., 133 F.2d 541, 545; Katz v. Horni Signal Mfg. Corp., 2 Cir., 145

**FRANK, Circuit Judge (dissenting).**

It is well to say at the outset that, as I shall try to show later, I think that the "atmosphere," unfavorable to defendants, described by my colleagues, is non-existent —that, on the basis of record facts not mentioned by my colleagues, the trial judge's finding of Eben's lack of bad faith is by no means "clearly erroneous." There should be noted, too, a factor which, as I shall also try to show later, is related to Eben's good faith: The trial judge in his opinion explicitly found that plaintiff had failed to prove acquisition of a "secondary meaning"; the plaintiff does not contest that finding;[1] and it is supported by the evidence.

Contrary to my colleagues' statement, the trial judge did not enter "a judgment holding the trademark valid, but not infringed." His conclusions of law and his judgment are silent as to validity. In his opinion, he said that, even assuming the trademark was valid, it had not been infringed.[2] But, in order to reverse his judgment (which dismissed on the merits) my colleagues necessarily have decided in favor of validity.

In so deciding, my colleagues concede that a "merely geographical" name cannot at common law be the subject of a valid "technical" trademark (i. e., one which is valid although it has not acquired a "secondary meaning"), and that such a name cannot be validly registered under the existing Trade Mark Act of 1905. They justify their decision by holding that the name LaTouraine is not "merely geographical" because (1) plaintiff prefixes it with "La"; (2) "Touraine" is no longer used by the French government as the official name of a part of France; (3) plaintiff omits a space between "La" and "Touraine"; and (4) plaintiff's mark would be valid if it were to be registered hereafter, on or after July, 1947, under a new federal statute (enacted long after this suit began) which by *its terms does not go into effect until next*

F.2d 961. In Altvater v. Freeman, 319 U.S. 359, 363, 63 S.Ct. 1115, 1117, 87 L. Ed. 1450, the Court said: "To hold a patent valid if it is not infringed is to decide a hypothetical case."

year. I shall discuss each of these arguments in turn.

1. It is an unquestioned feature of the French language that the definite article—"Le" or "La," the equivalent of our "The"—must be placed before the name of a province, a mountain, a river, or a county. Without it, the name, to a French eye, stands awkwardly unclad, distractingly nude. To omit it would be like saying in our tongue, "Between he and I." Thus, in speaking or writing French, one must say La Bretagne, Le Mont Blanc, La Seine, L'Amerique. When, then, plaintiff made "La" part of its tradename, it did not thereby render it non-geographical, "fanciful," since plaintiff did not change one iota the well-known French place-name. On the contrary, plaintiff adopted that name literally and correctly.

To be sure, plaintiff might have Anglicized (or Americanized) the name by dropping "La." But retention of the French form did not eliminate the geographical significance. French grammar thus disposes of this contention.[3]

2. Seeking casually for a reference as to the meaning to Americans of Touraine, I find, on the bookshelf of a furnished house I am renting for the summer, a textbook, entitled Contes Des Provinces, written by Miss Roth, an American high-school teacher, published in 1924 (by the well-known school-book publisher, the American Book Company) for instruction in French in American public high-schools. The author, after stating that the ancient French provinces had been replaced, following the Revolution, by "political divisions called departments," adds that "the modern department exists only for administrative purposes" and says, "Les provinces ont cessé d'exister dans l'organization politique actuelle mais leurs noms sont restés dans l'usage." More specifically, she writes, "La Touraine, ce Jardin de la France, est aussi le pays des châteaux. * * *" In other words, in common French usage, taught to American children in our public-schools, La Touraine is a geographical, not a "fanciful," name.

On the same bookshelf is a popular American encyclopedia, The World Book Encyclopedia; turning to the article on France, published in 1944, I find a map of contemporary France, giving the present official names of the departments; but the same page contains a smaller map, captioned "Former Provinces," showing their respective locations and including Touraine. I have asked a dozen American men and women, selected at random, what Touraine means; their invariable reply was "a part of France."

It has been held—I can find no contrary decisions—that, for purposes of the doctrine here under discussion, usage, not official nomenclature, governs, that a name may be entirely geographical although without official sanction. See In re Mid-West Abrasive Co., 146 F.2d 1011, 32 C.C. P.A., Patents, 834; cf. Kraft Cheese Co. v. Coe, 70 U.S.App.D.C. 297, 146 F.2d 313; Siegert v. Gandolfi, 2 Cir., 149 F. 100, 101.

3. In registering its mark, and generally in using it, plaintiff spells "La" with a small "a," but leaves no space between the article and Touraine. The word, as used by plaintiff, is printed LaTouraine. Surely, since "La" is an integral part of the name, that slight typographical change —which, unless attention were directed to it, none but a lynx-eyed person would detect—cannot suffice to convert this symbol into "an entirely arbitrary name." Suppose, for instance, that some one were to use "New York" or "New Jersey" as a trade symbol. Would either name cease to be "merely geographical" if its two parts were printed as "NewYork" or "New-Jersey"? There is no precedent for such a curious suggestion.

4. Of course, if a geographical name is coupled with some other name or is otherwise substantially altered, it is not "merely geographical," and, being thus converted into an "arbitrary" or "fictitious" name, is the subject of a valid trademark. Such are the rulings in the cases cited by my colleagues, i. e., Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 ("The American Girl");

---

[3] Even if one took an American place name, say "Chicago," I doubt whether adding "The" would transform it from its "merely geographical" status.

Century Distilling Co. v. Continental Distilling Corp., D.C., 23 F.Supp. 705, modified 3 Cir., 106 F.2d 486 ("Dixie Belle" and "Dixie Beau").[4] Such cases are not in point here.[5]

5. There remains an argument explicitly made by plaintiff, but implied by my colleagues, i. e., that a name is not "merely geographical" if only it is employed as a symbol for a product not manufactured, grown, processed or sold in the named geographical area. Repeatedly, this contention has been flatly rejected. See, e. g., In re Kraft-Phenix Cheese Corp., 120 F.2d 391, 28 C.C.P.A., Patents, 1153, as to a French town, "Chantelle" used as the name of a cheese made in Illinois; Companhia Antarctica Paulista v. Coe, 79 U.S.App. D.C. 316, 146 F.2d 669, as to the use of "Antarctica," an uninhabited territory where, of course, nothing is manufactured; In re California Perfume, Inc., 56 F.2d 885, 886, 19 C.C.P.A., Patents, 1028, as to "Avon" applied to toothbrushes made in the United States. A seemingly contrary decision, In re Plymouth Motor Corp., 46 F.2d 211, 213, 18 C.C.P., Patents, 838,[6] was explicitly over-ruled in In re Canada Dry Ginger Ale, 86 F.2d 830, 832–833, 24 C.C. P.A., Patents, 804, and In re Lamson & Co., 135 F.2d 1021, 30 C.C.P.A., Patents, 1030. Except for the over-ruled Plymouth Motor case, I find no decision sustaining plaintiff's argument, nor do my colleagues cite any.

Perhaps for that reason, my colleagues invoke the new Trade Mark Act of 1946, § 2(e) of which authorizes the registration, on and after July 1947, of a mark that "when applied to the goods of the applicant is" not "primarily geographically descriptive" or not "deceptively misdescriptive of them." Presumably (I am not sure) my colleagues think that this provision al-

ters existing "law," expunging the decisions cited in the preceding paragraph, so that, if registered thereunder, La Touraine would be a valid mark, merely because plaintiff's coffee is neither grown nor processed in France. Whether this section should be so interpreted I think we should not here consider: The striking fact is that this new statute, by its express terms—see § 46(a)—has no legal effect until July 1947. Maybe—although I incline to doubt it— Congress could have made retroactive the substantive aspects of this legislation. Since, however, Congress purposely refrained from doing so, I think a court exceeds its powers in thus applying it. I see no warrant for holding that defendants' rights are governed by this new Act, especially as § 46(a) provides that it "shall not affect any suit, proceeding, or appeal * * * pending."

Even more important than the consequences to the defendants here is the point that *we should not create a precedent, founded on that statute, not yet effective, adverse to the many persons who have heretofore used trade names under the existing Act as heretofore interpreted.*

My colleagues refer to this new Act as a "codification of trademark law" which may perhaps imply that it but restates the existing "law." If so, then my colleagues will, I think, find it impossible to cite cases sustaining plaintiff's contention (i. e., that the mark is not "merely geographical" because plaintiff's coffee is not grown, processed or sold in France).[7] Probably, however, my colleagues used "codification" in a broader sense, since they add that the 1946 statute "not merely amplified the Act of 1905, but gave to this property right a legislative standing it had not had before."

Of course, I agree that "we should hesitate to go against" a "clearly expressed

---

[4] The "Tabasco" case, M'Ilhenny v. Gaidry, 5 Cir., 253 F. 613, was recently differentiated in Kraft Cheese Co. v. Coe, 79 U.S.App.D.C. 297, 146 F.2d 313, on the ground that Tabasco is a "comparatively unknown place." Moreover it should be noted that the name "Tabasco" had acquired a secondary meaning at the time when the alleged infringement was commenced.

[5] In Havana Commercial Co. v. Nichols,

C.C.N.Y., 155 F. 302, cited by plaintiff, the court said there was no such place as "Carolina," since North Carolina, South Carolina, and the Carolina Islands were not "Carolina."

[6] There the name "Plymouth" was used in connection with the name "Chrysler" and a drawing of a sea-going vessel.

[7] I am not to be taken as saying that I think the 1946 Act will bear that interpretation.

\* \* \* legislative intent," and should not deny to anyone rights derived from a "grant" of this "statutory protection"—if and when a case comes before us to which this legislation applies. But I cannot comprehend how we have the right to regard that new legislative intent when Congress, in the plainest words, told us not to concern ourselves with it for another year. To construe that statute in this litigation is to render an advisory opinion, to decide a hypothetical case. (Indeed, as the new Act had not been enacted when the case was argued before us, neither party discussed it in briefs or oral argument.)

6. Most of the precedents by plaintiff in support of its position are not at all in point, being cases where a "secondary meaning" had been acquired in a geographical name, so that it no longer had the general significance which it otherwise would have had.[8] Fleischmann v. Schuckmann, 62 How.Prac., N.Y., 92, cited by my colleagues—relating to the use of the name "Vienna" as a label for a distinctive loaf of bread—is a case of this kind; in addition, in that case, there was direct imitation by the defendant not only of the name but of the label.[9]

Such cases are not apposite here. For (as indicated above) the trial judge explicitly found as a fact (in his opinion,[10] as well as in his subsequent more formal findings) that plaintiff had not proved acquisition of a secondary meaning. This finding my colleagues nowhere mention. They merely say, without discussing the evidence, that plaintiff, "through a broad and varied program of advertising \* \* \* attained a position of eminence in the industry, selling some fifteen million pounds

of coffee alone each year." But nothing is said by my colleagues about the place of that advertising and the distribution of those sales. Here is what the record shows:

Plaintiff's witnesses testified in the presence of the trial judge that it expended about $45,000 annually for advertising, but its principal witness said on the witness stand that plaintiff's "biggest expense was in newspapers in New England where we use front pages"; that all its radio advertising had been on New England radio stations; and that he did not know what part of its advertising was done in the New York metropolitan area. Plaintiff's evidence was vague as to the amount of coffee it sold in the area in which defendants do business, i. e., northern and northwestern New Jersey and Staten Island.[11] Apparently, much of the coffee sold by plaintiff around New York was sold in Manhattan, and a very considerable amount in bulk. As to the amount vended by plaintiff to small restaurants—to whom alone defendant sells—in defendants' area, the proof is by no means conclusive.

On the evidence, we cannot hold that the judge's finding of fact on this issue is "clearly erroneous"; nor do my colleagues do so. It is not without significance that plaintiff in its briefs and oral argument in our court did not contest this finding, but instead relied on its contention that it has a so-called "technical" trademark because its name is fanciful, not "merely geographical." That plaintiff established a secondary meaning in New England, or even in an area adjacent to that in which defendants trade, is not enough to give plaintiff a monopoly in that latter area.[12] Its rights there

---

[8] See, e. g., Elgin National Watch Co. v. Illinois Watch Co., 179 U.S. 665, 675, 676, 21 S.Ct. 270, 45 L.Ed. 365; Indian Territory Oil & Gas Co. v. Indian Territory Oil Co., 10 Cir., 95 F.2d 711; Governor, etc., Trading Into Hudson Bay v. H. Bay Fur Co., D.C., 33 F.2d 801; Jewish Colonization Ass'n v. Solomon & Germansky, C.C.N.Y., 154 F. 157; Caron Corp. v. Maison-Jeurelle Seventeen, D.C., 26 F.Supp. 560; The Anheuser-Busch case, 2 Cir., 295 F. 306, is not apposite, as the name was registered under the "ten-year clause." In Stein v. Liberty Garter Mfg. Co., D.C., 198 F. 959, the

question of the geographical character of the name "Paris" was not discussed.

[9] As already noted, M'Ilhenny v. Gaidry, 5 Cir., 253 F. 613, involving the use of the name "Tabasco," was a case of an acquired secondary meaning.

[10] That finding, therefore, is not subject to the criticism which my colleagues level at his more formal findings.

[11] This, too, is the area in which defendant Eben had worked as a salesman before he went into business on his own through the defendant corporation.

[12] See, e. g., United Drug Co. v. Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.

depend on its use there. The "mark means one thing in one market, an entirely different thing in another," a trademark being like neither a patent nor a copyright.[13]

7. If the foregoing is correct, plaintiff had no monopoly in defendants' trading area, and therefore defendants did not infringe. But even assuming, arguendo, that plaintiff had established such a monopoly, I think there was no infringement.

My colleagues stress Eben's alleged bad faith which, were it proved, would undoubtedly strengthen plaintiff's case on the infringement issue, i. e., on the issue of the likelihood of confusion between the two names.[14] But the same evidence which supports the trial judge's finding as to lack of a secondary meaning of "La Touraine" in defendants' territory also goes to support his finding as to Eben's good faith when his company adopted the name Lorraine: Eben, up to that time, had been working as a coffee salesman in that same territory, and plaintiff did not prove that its name had there become well known to the trade.

We exceed our authority, I think, if we say that the trial judge, *who heard and saw the witnesses,* was obliged to disbelieve Eben and to believe the testimony of his former employer (who, plaintiff admits, had a deep grudge against Eben). We have recently been admonished several times by the Supreme Court not to assert our own view of the facts on the basis of a mere printed record.[15] Judge Learned Hand, when he wrote his opinion in Ramopa Co. v. A. Gastun & Co., D.C., 278 F. 557, cited by my colleagues, was sitting as a trial judge who had seen and heard the witnesses; consequently his disbelief of defendants' testimony in that case was obviously within the scope of his authority.[16] Moreover, the seemingly improbable sometimes turns out to be the truth; and the courts have often held that a determination of whether the improbable has occurred, and the calculation of probabilities, are for the trier of the facts, judge or jury, if that trier has seen and heard the witnesses.[17] For us, in a case like this, to pass on the veracity and credibility of the witnesses would be, as we have recently said, "to convert an appellate court into a trial court." [18]

My colleagues suggest that the trial judge's opinion reveals his sympathy with the defendants. To me, that fact seems irrelevant. The motives of all men, judges included, are tangled. But we should know, from our own experiences on the bench, that a judge can, as he should, put to one side irrelevant sympathies, and that to do so is especially easy when, as here, a judge is consciously aware of and articulates them; the mischievous prejudices are precisely those of which one is not fully aware.[19]

There is no escape from the circumstance that the trial judges, because they conduct the fact-finding process, are the most important judicial officials.[20] Fact-finding, when a judge sits without a jury and the record consists of oral testimony, is his responsibility, not that of the upper courts. Only when it is clear beyond doubt that he has closed his eyes to the evidence, may an upper court properly ignore his version of the facts. Since his "finding" of "facts," responsive to the testimony, is inherently

Ed. 141; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; cf. United States Printing Co. v. Griggs & Co., 279 U.S. 156, 158, 159, 49 S.Ct. 267, 73 L.Ed. 650.

13 United Drug Co. v. Rectanus Co., supra; cf. Pretonettes v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731.

14 Restatement of Torts, § 729(b) and comment (f); Eastern Wine Corporation v. Winslow-Warren, Ltd., Inc., 2 Cir., 137 F.2d 955, 960.

15 Bihn v. United States, 66 S.Ct. 1172; Kotteakos v. United States, 66 S.Ct. 1239; Bollenbach v. United States, 326 U.S. 607, 66 S.Ct. 402; Weiler v. United States, 323 U.S. 606, 611, 65 S.Ct. 548, 89 L.Ed. 495, 156 A.L.R. 496.

16 Moreover, as the opinion discloses, the discredited testimony was far more improbable than Eben's.

17 See cases cited and quoted in Arnstein v. Porter, 2 Cir., 154 F.2d 464, 469.

18 Arnstein v. Porter, supra, 154 F.2d at pages 472, 473.

19 In re J. P. Linahan, Inc., 2 Cir., 138 F.2d 650, 652, 653.

20 United States v. Forness, 2 Cir., 125 F.2d 928, 942; cf. Green, The Duty Problem in Negligence Cases, 28 Col.Law Review (1928) 1014, 1037.

subjective (i. e., what he actually believes to be the facts is hidden from scrutiny by others), his concealed disregard of evidence is always a possibility. An upper court must accept that possibility, and must recognize, too, that such hidden misconduct by a trial judge lies beyond its control. Only, perhaps, by psycho-analyzing the trial judge could his secret mental operations be ascertained by us; and we are not skilled in that art, which, at the least, would require many hours of intensive personal interviews with the judge.

8. Undeniably, on the issue of infringement, confusion of customers is pivotal. I agree that there need be no proof of actual instances of such confusion—where its likelihood is unmistakably clear. Where that is the case, an appellate court may reject a contrary conclusion by the trial judge.

However, courts, when not guided by evidence, may easily go wrong on that subject. Tests made by a competent psychologist of the reactions to trade names that had been previously involved in litigation indicate that the judicial decisions have not infrequently failed to match the responses of ordinary consumers.[21] Even without the benefit of such tests here, however, I would agree that, were the customers, for whose patronage plaintiff and the defendants compete, ordinary retail buyers, there would be enough likelihood of confusion to prove infringement.

But here the defendant company does not sell to ultimate consumers; nothing in this record even intimates that such persons, when they drink that defendant's coffee, are aware that it bears any particular name. For defendants sell solely at wholesale to owners of small restaurants; and there is no evidence that they inform their retail customers of the brand sold to the latter at retail by the cup. Concededly, there is no similarity in the packages of the parties; the only similarity consists in the names. This, then, is decidedly pertinent: With respect to probable confusion, whether the class of buyers is sophisticated has been held to be a matter of prime importance. See, e. g., Pyle National Co. v. Oliver Electric Manufacturing Co., 8 Cir., 281 F. 632, 635; Everlasting Val. Co. v. Schiller, D.C., 21 F.2d 641; Standard Acc. Ins. Co. v. Standard Surety & Casualty Co., D.C., 53 F.2d 119, 121; T. B. Woods Sons v. Valley Iron Works, C.C.Pa., 191 F. 196, 201; Dunlap v. Willbrandt Surgical Co., 8 Cir., 151 F. 223, 232; cf. N. K. Fairbank v. R. W. Bell Mfg. Co., 2 Cir., 77 F. 869, 875; Ph. Schneider Brewing Co. v. Century Distilling Co., 10 Cir., 107 F.2d 699, 704.

In the absence of evidence of actual instances of confusion, or of tests (of the sort above mentioned) showing probable confusion, in the minds of the wholesale buyers from the defendant company, I think we ought not to overrule the trial judge. At most (assuming plaintiff's exclusive title to the name), we should remand for further evidence on the confusion issue.

9. We have said that the paramount interest to be protected in these trade-name cases is the consumers'.[22] The courts, therefore, should not go out of their way (as my colleagues, I think, are doing here) to create such a judge-made monopoly where no evidence of needed protection for that interest has been presented.[23] It will not do for my colleagues to say that "a monopoly of the words 'La Touraine-Lorraine' for the coffee-bean hardly seems world-shattering." For, although decisions "in this area of trade-mark law" may not be "conclusive," they do tend to breed their own kind; and the decision in the instant case, if followed in others, will

---

[21] Burtt, Legal Psychology (1931) Ch. 20.

[22] See, e. g., Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F. 2d 955; cf. Johnson & Son v. Johnson, 2 Cir., 116 F.2d 427, 429; R. C. A. Manufacturing Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90; Standard Brands, Inc., v. Smidler, 2 Cir., 151 F.2d 34, 38.

[23] As it might be asserted that, pursuant to Erie R. Co. v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, we should, at least on the issue of secondary meaning, follow "state law," it may be well to note the paucity of relevant New York decisions and the trend in New York toward strictness in this field. See Zlinkoff, Monopoly Versus Competition, 53 Yale Law Journal (1944) 514, 550–551.

yield a multitude of judge-made name-monopolies granted by the courts without, I think, due regard for the public welfare.[24] What I have said elsewhere [25] will demonstrate that I am not a victim of monopoly-phobia, actuated (to quote my colleagues) by "some remote fears of * * * social disaster" which might be caused by adherence to the judicial precedents concerning trade-names. My dissent here stems from my belief that this particular plaintiff has not shown that, within the doctrine of those precedents, it has a name-monopoly, in the territory in question which justifies us in stopping defendants' competition. This decision, I think, unjustly interferes with the defendants and, in departing from accepted principles, opens the door to other monopolies improper under the existing law.[26]

---

[24] There can be no doubt that the monopolies built up under the trade-name doctrine are judge-made. In recent years, the courts, conscious of that fact—and of the need to protect the public—have been more cautious than they had been theretofore in creating such non-statutory monopolies. See my concurring opinion in Standard Brands, Inc., v. Smidler, 2 Cir., 151 F.2d 34, 38–42.

As has often been noted, the Trade Mark Act of 1905 affected procedure only, and added nothing substantively to the judge-made doctrine (except in so far as increased faciles for obtaining remedies can be said to augment "substantive rights").

[25] In Eastern Wine Corp. v. Winslow-Warren, Ltd., 2 Cir., 137 F.2d 955, 958–959, speaking for the court, I said: "There are some persons, infected with monopoly-phobia, who shudder in the presence of any monopoly. But the common law has never suffered from such a neurosis. There has seldom been a society in which there have not been some monopolies, i. e., special privileges; the legal and medical professions have their respective guild monopolies; the owner of real estate, strategically located, has a monopoly; so has the owner of a valuable mine; and so have electric power companies. No one seriously questions whether there should be some monopolies; the only question is as to what monopolies there should be, and whether and how much they should be regulated legislatively or curbed judicially." See also my concurring opinion in Standard Brands, Inc., v. Smidler, 2 Cir., 151 F.2d 34, 37, 42.

[26] My colleagues' facile use of the phrase "property right" to describe plaintiff's interest is perhaps revelatory: The underlying question in this and similar cases is precisely whether, considering the conflicting social interests, the plaintiff should be accorded governmental aid through an order of a governmental agency, a court. Only if the government, through a court, grants that aid does the plaintiff have a "property right." For convenience, that phrase may be used as a shorthand label for the fact that plaintiff has received, or will receive, such assistance; it should not, however, be said or thought that he is so aided because he has such a "right." The label should not be allowed through circular (boot-strap lifting) reasoning to obscure the basic question of policy which the court ought squarely to face. See Felix Cohen's brilliant discussion, "What's in a Trade Name," in his article, Transcendental Nonsense and The Functional Approach, 35 Col.Law Review (1935) 809, 814–817; cf. 842, 849; cf. Standard Brands, Inc., v. Smidler, supra, 151 F.2d at page 40.