**GASTOWN, INC. OF DELAWARE, d.b.a.
Gastown, Inc., Plaintiff,**

v.

**GASTOWN, INC., Defendant.**

**Civ. A. No. 13504.**

United States District Court,
D. Connecticut.

Sept. 16, 1971.

Albert L. Ely, Jr., Ely, Golrick & Flynn, Cleveland, Ohio, John M. Prutzman, Prutzman, Hayes, Kalb & Chilton, Hartford, Conn., for plaintiff.

William E. Glynn, Thomas J. Groark, Jr., Day, Berry & Howard, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, District Judge.

The plaintiff is seeking injunctive relief and treble damages, because of the alleged infringement of its registered trade and service marks in violation of the Lanham Trade-Mark Act of 1946, 15 U.S.C. § 1051 et seq. The pre-trial order expressly reserved for subsequent proceedings an accounting of the profits or other damages in the event the plaintiff prevailed and the Court found reason for a further hearing. Jurisdiction is found to exist in this Court pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a); and venue lies under 28 U.S.C. § 1391(c).

The defendant, (1) in addition to denying the plaintiff's claims has affirmatively challenged the validity of both marks

and alleges (2) that the plaintiff is and has been using these marks to violate the anti-trust laws; (3) that it is barred by laches from asserting its claims; (4) that its rights were abandoned; and (5) that its acquisition of these marks failed to conform with 15 U.S.C. § 1060 and is invalid. The Court finds that the defendant's concurrent use of the plaintiff's registered marks does cause a likelihood of confusion, mistake or deception to potential purchasers as to the source of the product and constitutes an unlawful infringement. The plaintiff is entitled to protection against such infringement in the regional market area of Southern New England, where the defendant is selling its gasoline products through the widespread multiple location of service stations under the plaintiff's registered name and mark.

## FACTUAL BACKGROUND

The plaintiff, a Delaware corporation, has its principal office and place of business in Cleveland, Ohio. It is the current owner of the trademark "Gastown," filed March 25, 1957 on which a registration was issued November 5, 1957, for gasoline, diesel fuel and kerosene. It also owns the identical service mark for automobile and truck supply and maintenance services originally filed on May 16, 1957, on which a registration issued July 21, 1964. The parties have stipulated that each of these registrations has matured to an incontestable status, by the filing of the required affidavits under Sections 8 and 15 of the Lanham Act and have been duly accepted by the United States Patent Office, as of June 13, 1963, and July 3, 1969, respectively.

The plaintiff, Gastown, Inc., is in the business of selling gasoline and oil at wholesale to 97 Gastown service stations owned or leased by it in northern Ohio, together with one additional station at New Castle, Pennsylvania. The original Ohio corporation commenced to use the name "Gastown" in 1952. The plaintiff succeeded to the business and the use of the corporate name and marks by assignment for valuable consideration in Oc-

tober, 1961. Several of these stations are located adjacent to interstate arteries of traffic on United States regional and super-highways and advertise by signs their service facilities and access to these highways. The principal federal east-west traffic routes connecting the northeast industrial region of the United States are interstate super-highways I–90 and I–80 with interchange to Route 57 to U. S. Routes 6 and 20. The plaintiff's east and west chain of stations extend from the Toledo interchange on the Ohio Turnpike to Ashtabula, Ohio, a distance of 172 miles. A steady growth pattern for this business has been indicated during the past ten years by its increase from a chain of 41 stations to 97 stations and an annual business volume increase from 1.88 million to 18 million dollars.

Marathon Oil Company, the 18th largest major oil company in size in the United States, purchased 50% of the outstanding common stock in the plaintiff corporation on May 11, 1963. The present composition of the five-man corporate Board of Directors of Gastown, Inc., discloses two Marathon corporate employees and three Gastown representatives. (Tr. 606).

The defendant, Gastown, Inc., was first incorporated as a Massachusetts corporation in August 1968 and promptly registered to do business in Connecticut as an owner and operator of gasoline service stations. Up to that time, this business had been conducted by John R. Stanley through several different corporate names, which were personally owned or controlled by him. He sold unbranded gasoline at wholesale and retail. All of these separate corporate businesses were merged into the Massachusetts Gastown Corporation coincident with its incorporation in 1968. (Tr. 114).

It is the defendant's representation that as early as 1962 or 1963, the corporation's predecessor and alter ego, John R. Stanley, individually, had used the name "Gastown" to replace the station signs "Gas and Save," on the gasoline

service stations which he operated in Massachusetts, because that state required that the "on-premises" advertising at gasoline stations should eliminate any reference to competitive price. The defendant was then selling "bootleg" gasoline, otherwise described as non-major brand products from whatever source he could purchase it. (Tr. 128, 776). The defendant's principal witness, Stanley, could not support his claim of use of the name "Gastown" in 1962 or 1963 (Tr. 126) with anything but his personal recollection. It was not supported by any documentary evidence and he was vague or ambiguous on many essential facts. He claimed that all his income tax and other business records prior to the year 1968, had been destroyed and that none of his own business records mentioned the word "Gastown" prior to that date. The earliest reliable business record of a third party who had erected commercial signs for the defendant showed that Stanley first used the name "Gastown" in September, 1964 (Tr. 732–735, Defendant's Exhibit "O"). This date was further corroborated by the business record billings of Dick's Crane Service, which showed that it had changed the name on the station signs commencing on October 8th and 9th, 1964 (Defendant's Exhibits "O" and "P"). The Court finds that Stanley did not use the name "Gastown" until October 8, 1964.

Stanley represented that he believed he had first seen the name "Gastown" in Prospect, Connecticut, in the early 1960's, on a service station owned by one Alfred W. Martin, Jr. However, his use of that name at his Waterbury, Connecticut, station must have been after October 8th and 9th, 1964, because Stanley stated that he had first used the name in Palmer, Massachusetts, and that use did not occur until October 8, 1964. Stanley did subsequently use the name "Gastown" on a station operated by him in the Waterbury-Prospect area. At that time, Martin remonstrated with him over the latter's alleged unlawful use of the name, because Martin had registered it on November 1, 1962, under state law in the office of the Town Clerk of Prospect. This was prior to the time defendant first used it in 1964 or 1965 (Tr. 738, 785, Plaintiff's Exhibit 55). However, he convinced Martin to take no legal action and explained to him that the general public would assume that both of them together actually constituted one large company (Tr. 786). He also promised he would build no other stations in the immediate area. Stanley apparently recognized even then, that the use of the "Gastown" name in the same market area by competitors would be likely to deceive and confuse the general public.

The present tradename used by both parties is identical in substance, if not in form. The defendant wants this Court to distinguish the use of the name, because of the shape or color of the sign or mark. The plaintiff's standards or signs are circular with either red letters on a white background or white letters on a red background. The word gas appears over town and the cross of the "T" extends under the word gas. The letters are slanted approximately 20 degrees from a horizontal position.

The defendant's standards or station signs, on the other hand, are square with a yellow background. "Gastown" appears on a six-sided plaque with a white background attached to the yellow sign. The word gas appears over the word town with red horizontal letters.

Both parties operate their own tank trucks over the highway to serve their retail outlets and on each truck there appears in large letters the name "Gastown." The plaintiff's trucks are red with the name "Gastown" printed on the side in white; while the defendant's trucks are white and the name "Gastown" appears in red letters on a yellow and white background.

The form of the exterior lettering on the buildings of both parties is substantially identical. The Court finds that the use of the marks by the plaintiff and defendant cannot be distinguished by the shape and color of the station signs and truck emblems. Despite the minor dif-

ferences outlined above, the marks are so similar that the average consumer might readily fail to discern that they represent different corporations.

The plaintiff's primary advertising is its on-premises display signs including the high rise signs located at the retail outlets. This advertising is supplemented by listings in the yellow pages of the telephone directory, the local newspapers, and radio, and on the back of buses within a fifty mile radius of Cleveland, Ohio. The defendant's advertising, with the exception of the radio and bus outlets, is similar to that of the plaintiff's.

### ISSUES

(1) Is there likelihood of confusion, mistake, or deception to the consuming public, as to the source of the product being sold by reason of the concurrent use of the tradename "Gastown."

(2) Is the plaintiff barred from equitable relief by reason of laches or an abandonment of its rights.

### LAW

The defendant's counsel, in the presentation of this case, recognized and conceded that the use of the contested marks in the same market area would in fact confuse the general public and the plaintiff would be entitled to equitable relief. However, its legal posture is that since the geographical distance between the nearest service station of the plaintiff and that of the defendant is 443 miles (Tr. 769), the marketing areas are distinct and separate; and therefore, it contends, there should be no likelihood of customer confusion (Tr. 33–37). The defendant claims this is especially true here, because the mark "Gastown" is a weak mark, since it is simply descriptive of a location where gasoline and service can be purchased.

The parties stipulated that they are both engaged in interstate commerce in the sale of motor fuels and in rendering automobile and truck maintenance supply services to the public under the name "Gastown." This service trademark was adjudicated to be a valid mark used in interstate commerce in Application of Gastown, Inc., 326 F.2d 780, 51 CCPA 876 (1964). Subsequent to that application being filed, the plaintiff opened the New Castle, Pennsylvania, station in 1963, and from the record it would appear that the latter station operation did not enter into the court's decision on the merits. (Tr. 585, 586). See Pure Oil Co. v. Puritan Oil Co., 127 F.2d 6, 8 (2d Cir. 1942).

The basic factual and legal issue to be resolved under the Lanham Act, 15 U.S.C. § 1114(1) is whether or not the defendant's concurrent use of the plaintiff's registered mark is likely to cause public confusion or mistake or deceive potential consumers, as to the origin of the motor fuels being sold and distributed. This § 1114(1) provides in part:

"Any person who shall, without the consent of the registrant—

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; * * *

\* \* \* \* \* \*

"shall be liable in a civil action by the registrant * * *."

This is not the type of case where a defendant adopted a mark in a market area, prior to its lawful registration, where the defendant concurrent user might gain a statutory right to exploit the mark exclusively in a limited market. 15 U.S.C.A. § 1115(b) (5); Aluminum Fab. Co. of Pittsburgh v. Season-All W. Corp., 259 F.2d 314 (2d Cir. 1958). The plaintiff's registrations of its trademark and service mark were issued on November 5, 1957, and July 21, 1964, respectively, while the defendant's first actual provable use was not until October 8, 1964.

"(T)he Lanham Act, 15 U.S.C.A. § 1072, provides that registration of a trademark on the principal register is constructive notice of the registrant's claim of ownership. Thus, by eliminating the defense of good faith and lack of knowledge, § 1072 affords nationwide protection to registered marks, regardless of the areas in which the registrant actually uses the mark.
*    *    *

"That such is the purpose of Congress is further evidenced by 15 U.S. C.A. § 1115(a) and (b) which make the certificate of registration evidence of the registrant's 'exclusive right to use the * * * mark in commerce.' " Dawn Donut Company v. Hart's Food Stores, Inc., 267 F.2d 358, 362 (2d Cir. 1959).

The defendant resists the Court's granting equitable relief in this instance by pointing out the limitation for awarding such relief set out in the *Dawn Donut Company* case, wherein the Court said:

"(T)he registrant may enjoin only that concurrent use which creates a likelihood of public confusion as to the origin of the products in connection with which the marks are used. Therefore if the use of the marks by the registrant and the unauthorized user are confined to two sufficiently distinct and geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark." *Dawn Donut, supra*, 267 F.2d at 364.

The issue then becomes whether the parties are operating in separate markets or whether both operate in a single, cohesive geographic market.

The plaintiff presently operates 97 gasoline service stations in Ohio and one in Pennsylvania; the latter being supplied and serviced from Youngstown, Ohio. The general area of distribution is in northern Ohio, (Defendant's Ex-

hibit "M"), where its sales exceed 60 million gallons, with gross income of 18 million dollars. (Tr. 526). Approximately 300,000 gallons per month are sold on Master Charge or Bankamericaid, both nationally recognized credit cards. (Tr. 527).

The principal highways connecting the plaintiff's and the defendant's areas are Interstate 90 and U. S. Routes 20 and 6. From the interchange just west of Cleveland, Ohio, interstate I–80 and I–90 merge together as the "Ohio Turnpike." At that part, I–90 branches northeasterly along Lake Erie toward the Buffalo, New York area and thence east across New York State into and through Massachusetts, where the defendant's stations extend from cities and towns on the western border (Great Barrington, Lee, Pittsfield and Adams) to Orleans and other towns on Cape Cod. Route I–80 continues southeasterly to the Youngstown, Ohio area, thence easterly to a projected interchange with I–84, now completed in Connecticut from the Derby area (where defendant has several stations) to Hartford. Completion of the section of I–80 and I–84 now under construction in the Youngstown, Ohio area, in Pennsylvania and Southern New York will provide an alternate direct continuous super-highway from the plaintiff's present territory to the defendant's present territory corresponding to that now provided by I–90 and I–91.

All of the defendant's 132 Gastown stations are located in Massachusetts and Connecticut, with the exception of one in Rhode Island. These retail outlets sell "Gastown" brand motor fuels and render automobile and truck supply maintenance services. On August 4, 1969, when the plaintiff first served written notice of infringement, the defendant then had 65 such stations in the greater Springfield, Massachusetts area and Hartford, Connecticut area. When suit was filed on November 3, 1969, there were 74 stations; and at the time of trial 132 were operating with five more new stations scheduled to be opened. The rapidly expanding promotion of the defendant's

chain is living testimony not only of the defendant's able promotional ability, but that the name "Gastown" has developed a secondary meaning; a friendly haven for those in need of gasoline and automotive service.

"If a descriptive word has taken on a secondary meaning, however, courts will afford equitable protection to the party whose use of the word has created the secondary meaning. See Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d 538 (2 Cir. 1956). If because of association with a particular product or firm over a period of time a word has come to stand in the minds of the public as a name or identification for that product or firm, the word is said to have acquired a secondary meaning."

\* \* \* \* \* \*

"(A)s the term is here used by this defendant in its corporate name, we conclude that such use is a trademark use. See 3 Callman, Unfair Competition and Trade-Marks 1669 (2d ed 1950). Therefore, the plaintiff is entitled to equitable relief \* \* \*." Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 498–499 (2d Cir. 1962).

Although the defendant has perhaps also fashioned a secondary meaning in the symbol "Gastown," the equities in this case necessarily must consider the balancing of this build up of good will against the danger of public confusion as to product's origin—and the latter factor is largely determined in this case by the realistic overlap in the parties' respective geographic territories.

The defendant's largest volume station is on West Columbus Avenue in Springfield, Massachusetts, and located adjacent to the interchange with I–91. Its second largest volume outlet is in East Hartford, adjacent to the interchange with U. S. Route 6. The defendant admits that it operates at least four Gastown stations on U. S. Route 20, at least five stations on or adjacent to interchanges with U. S. Route 6, and at least three other stations adjacent to interchanges with I–91. Those stations located at such interchanges and turn-offs are advertised to travelers by lighted elevated signs and high rise signs to solicit and attract approaching transient customers on the throughways. Since 1960, the plaintiff has been advertising its products by large signs on the back of buses in the Cleveland-Akron area. These buses travel on federal highways, including I–90 and U. S. 6 and 20, thus exposing the interstate traveling motorists to the "Gastown" mark.

At the time of trial, the defendant was advertising for the purchase or lease of additional gasoline station sites in newspapers published in Connecticut, Massachusetts, New York, and Louisiana. However, it disclaimed any present intention to expand into New York State under the name "Gastown," but inferred that it contemplated using the name "Gasland," for which it has an application for registration now pending. (Tr. 465).

No highway survey was made as to the actual numbers of the transient public moving by automotive power in the northeastern industrial area of the United States, between northern Ohio and southern New England. However, the plaintiff did produce air-travel passenger statistics between Cleveland and the greater Hartford-Springfield area and between Cleveland and the Boston area, to demonstrate the natural tremendous interchange and movement of people. This survey disclosed that in 1964, 33,600 travelled to or from Cleveland to Hartford or vice-versa; 1965—42,250; 1966—49,750; 1967—53,180; 1968—63,460; and the estimated projection for 1969 was 77,000; 1970—72,500, and 1971—72,000. (Tr. 101, Plaintiff's Exhibit 15). Similar figures from Toledo to Hartford and vice-versa were: 1963—1780; 1964—2380; 1965—2679; 1966—2560; 1967—2830, and 1968—3520.

Statistics covering the air passenger traffic from Boston to northern Ohio and vice-versa were practically double

(140,000) the passenger movement to and from the Cleveland and Hartford-Springfield areas. It is conceded that these figures do not provide an accurate count of potential highway customers for the products and services of the litigants. However, this single illustration taken from only one medium of transportation does realistically demonstrate the natural mass movement of people in the northeastern industrial region.

> "We may take judicial knowledge that, in our day, the goods of appellant and appellee are retailed, almost exclusively, at service and filling stations. Modern traffic moves rapidly. The customer desiring to purchase these goods is attracted to symbols or signs on service stations and pumps, which he has associated with the goods he ordinarily buys." Derby Oil Co. v. White Star Refining Co., 62 F. 2d 984, 986, 20 C.C.P.A., Patents, 816 (C.C.P.A.1933).

It is not an uncommon event for traveling motorists (not to mention trucks) to drive from Hartford, Springfield, or Boston to Cleveland or Detroit in a single day over interstate super-highways. These potential "Gastown" customers would certainly be likely to be confused, by the duplicity of the identical names as service marks along the route. This is not a situation where the tradename is used at an obscure, isolated service station, like the "Gastown" station in Prospect, Connecticut. The facts disclose a widespread, saturated, chain distribution use of the plaintiff's identical name and mark in a cohesive regional market and in a type of industry, where it is most likely to deceive the traveling public. The American motorist is no longer subject to the limitations of provincial or state line horizons. Transportation, advertising, and communications have regionalized or in some instances nationalized the general public's exposure to tradenames, especially in the field of gasoline products.

> "If there is likely to be confusion among reasonably careful purchasers, the court need not have before it evidence of actual instances of confusion. It is a matter for the court to determine from the circumstances of each case." American Thermos Prod. Co. v. Aladdin Industries, Inc., 207 F.Supp. 9, 26 (D.Conn.1962). *See also*, La-Touraine Coffee Co. v. Lorraine Coffee Co., 157 F.2d 115, 117 (2d Cir. 1946). Restatement, Torts § 729 (1938).

Each infringement case usually develops its own special pattern of facts. Several factors, particularly the nature of the product, and the density and spread of distributive outlets, determine the extent of the geographic market and hence the likelihood that confusion would arise as to product origin if two firms are using the identical tradename. In this case the product, gasoline, is one that is sold throughout large geographic markets by many firms. Thus, it would not at all surprise the average consumer from Ohio to discover that the same firm he patronizes in Ohio is apparently selling gasoline in southern New England. Further, as already pointed out, the defendant's presence in southern New England is not occasional but rather widespread.

> "A corporate name or trade name identifies a corporation; it also identifies its business and the goods or services which it sells or renders. If a junior corporation appropriates such name or a name so similar thereto as to lead to confusion, it appropriates the reputation that goes with it and removes that reputation beyond the power of the owner to protect. Unless the junior's business is so foreign to the senior's as to insure against the public confusing the two, it is unlawful." Standard Oil Co. of New Mexico v. Standard Oil Co. of Cal., 56 F.2d 973, 978 (10th Cir. 1932).

While the narrowest tradename territorial limits customarily imposed are along state boundary lines, that does not suggest a limitation upon a regional market area where interstate traffic patterns have established a broader market for such a product as gasoline or automotive service. The plaintiff's chain of service stations located adjacent to or at the junction of super-highways with

appropriate access turnoffs from Toledo, Ohio, east to Ashtabula, Ohio, a distance of 172 miles (Tr. 769), complemented by the defendant's chain of identically named stations in Massachusetts and Connecticut, along extensions of the same highways, is likely to cause confusion as to the product source and mislead the interstate traveling public. As the defendant's alter ego, Mr. Stanley, so aptly explained to Mr. Martin (Tr. 786) "It looks to the public like we are one big company."

"His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." Ambassador East, Inc. v. Orsatti, Inc., 257 F.2d 79, 82 (3rd Cir. 1958), quoting Yale Elec. Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928).

In addition to the natural likelihood of confusion, where both the plaintiff and defendant are using the identical corporate and product-service name "Gastown, Inc.," the evidence disclosed several spontaneous instances of actual confusion.

"Section 45 of that Act (15 U.S. C.A. § 1127) defines 'colorable imitation' to include 'any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive purchasers.' Thus, it is clear that the test is likelihood of confusion and not the quantity of actual confusion.

"Although plaintiff proved several instances of actual confusion, such proof is not required." G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 388 (7th Cir. 1959).

Nolan, a market development representative for Marathon Oil Company, a parent-owner company of the plaintiff, (having a 50% interest therein) was in Connecticut on March 31, 1969, on company business, when he observed a "Gastown" service station on I–90. His first thoughts were that "Gastown" of Delaware, the Ohio based company, had expanded that far east. (Tr. 42). Mrs. Civiletto, who knew the owners of the "Gastown" gasoline company and bought the product in Cleveland, said she was thrilled during her visit to Springfield, Massachusetts, to see a lighted "Gastown" sign and said, "Well, maybe Joe is going to start from coast to coast." (Plaintiff's Exhibit 37, pp. 1–13). Rancotti, a Cleveland restaurant operator, while visiting Cape Cod, inquired of the "Gastown" owner back in Cleveland, what their operation was in Massachusetts, because he had seen one of their "Gastown" trucks there and thought they were opening up new branches. (Plaintiff's Exhibit 36, pp. 1–10; also see Plaintiff's Exhibit 72).

"Actual confusion or deception of purchasers is not essential to a finding of trademark infringement or unfair competition, it being recognized that 'reliable evidence of actual instances of confusion is practically almost impossible to secure.' But where such proof has been adduced, weight should be given it." Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 761 (2d Cir. 1960).

Miss Kelleher, who presently resides in Bridgeport, Connecticut, had previously attended Baldwin-Wallace College, in Berea, Ohio, and had either bought gasoline or been in cars that did buy "Gastown" gasoline in Cleveland. When she subsequently visited her college friend, (a daughter of one of the plaintiff's corporate officers), she volunteered, Your father's stations are really spreading to the east, because I've seen a couple of them in Bridgeport. (Tr. 198–200). The foregoing facts disclose specific in-

**634**

stances of actual confusion of names and product.

"Although there was no evidence that particular purchasers were actually deceived into believing that the heels (product) sold by the respondent were manufactured by the petitioner, the District Court found that there was a 'reasonable likelihood' that some purchases might have been induced by the purchaser's belief that he was obtaining the petitioner's product." Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 204, 62 S.Ct. 1022, 1023, 86 L.Ed. 1381 (1941).

Supervised quality product control is a prime factor for the maintenance of a good consumer public image in the gasoline market. The plaintiff has insured its reputation for standardized quality through a single source of supply, the Marathon Oil Company. This stable relationship enables the plaintiff to prescribe and enforce strict standards for its product and maintain a consistent high quality. (Tr. 547). Its service station operators are selected for their ability to provide efficient service, as well as to manage a clean and attractive station. This close supervision over distribution outlets is essential to guard against an inferior product. It is common knowledge that failure to provide periodic service station tests for evidence of the accumulation of water condensation in ground storage tanks, can cause contamination and permanently damage the product's quality image. The plaintiff's products should not be subjected to this risk in its regional market area.

The defendant's third and fourth affirmative defenses assert that the plaintiff should be denied the right to file any claim for infringement of its marks, because it acquiesced in the defendant's use of its registered mark and should be barred by laches. No credible evidence was offered by the defendant to prove that it had publicly used the "Gastown" mark until October 8, 1964 (Tr. 663–664) which was subsequent to the issuance of the plaintiff's registered

trademark. Stanley represented that he had talked with an officer of Marathon Oil Company, between April and November, 1967, (Tr. 462) to procure a source of gasoline supply of approximately one million barrels and had advised one of its officers at that time of his use of the "Gastown" tradename. He claimed that this conversation gave the plaintiff adequate notice of the defendant's use.

However, no verification was offered of this telephone call and the plaintiff's officers vehemently denied that it had ever occurred. (Tr. 472–75, 541). The defendant admitted that it knew of the plaintiff's existence under the name of "Gastown" as early as 1965 or 1966 (Tr. 554–555) and the parties stipulated that the plaintiff's name appeared in the National Petroleum News Fact Book (the industry bible) regularly since 1961. (Tr. 236). The defendant conceded that it had taken no action to inquire as to the prior registration of the challenged marks. The evidence did disclose that the defendant had procured a Dun and Bradstreet financial report on the plaintiff in December, 1968, and again in March, 1969. (Tr. 250).

At no time during its growth period was the defendant's name ever listed in the National Petroleum trade journal. (Plaintiff's Exhibits 58A and 58J). Its existence did not come to plaintiff's attention, until Nolan reported his observing the defendant's I–90 station on March 31, 1969. An investigation promptly followed and a formal report was made to the trademark committee of Marathon on May 6, 1969. A resolution was then adopted by the plaintiff's board of directors on July 8, 1969, to institute legal proceedings. (Tr. 539). On August 4, 1969, a formal written notice was given to the defendant and the present action was filed November 3, 1969. The Court finds that the plaintiff did act promptly in commencing this infringement action within a reasonable time after the knowledge had come to its attention. See G. D. Searle & Co. v. Chas. Pfizer & Co., 265 F.2d 385, 388

(7th Cir. 1959). *Also see,* Standard Oil Co. of Maine v. Standard Oil Co. of N. Y., 45 F.2d 309, 311 (1st Cir. 1930).

While the defendant now claims that an adverse court ruling, with its attendant change of tradename would involve the expenditure of substantial sums, (Tr. 771) the result would not be as devastating as it might first appear. The second word of the expression "Gastown" like the defendant's prior use of Gas "Mart" and Gas and "Save", all involve four letter words. A transposition to the defendant's most recent name registration "Gasland" presently in use in New York and Louisiana, would not entail prohibitive expense. Furthermore, the defendant's deliberate expansion of service stations under the plaintiff's known registered mark, while this action was pending, is not an equitable hardship consideration.

"It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them. The law is not made for the protection of experts, but for the public—that vast multitude which includes the ignorant, the unthinking and the credulous, who, in making purchases, do not stop to analyze, but are governed by appearances and general impressions." Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2d Cir. 1910).

The defendant's second and fifth affirmative defenses are so devoid of substantive proof that they need no comment.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court pursuant to Rule 52(a), Fed.R.Civ.P.

A decree in accordance with these findings and conclusions shall be settled on notice within fifteen (15) days. So ordered.